576 A.2d 241

SALLY FRANK, COMPLAINANT–APPELLANT, v. IVY CLUB, TI-
GER INN, AND TRUSTEES OF PRINCETON UNIVERSITY,
RESPONDENTS–RESPONDENTS, AND UNIVERSITY COT-
TAGE CLUB, RESPONDENT.

Argued January 30, 1990—Decided July 3, 1990.

*Sally Frank, pro se,* and *Nadine Taub* argued the cause for appellant (*Nadine Taub* and *Sally Frank,* attorneys; *Anna May Sheppard,* of counsel).

*Wendy L. Mager* argued the cause for respondent Trustees of Princeton University (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

*Susan L. Reisner,* Deputy Attorney General, argued the cause for respondent Division on Civil Rights (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Barbara Strapp Nelson* argued the cause for respondent Ivy Club (*McCarthy and Schatzman,* attorneys).

*Russel H. Beatie, Jr.,* a member of the New York bar, argued the cause for respondent Tiger Inn (*Lum, Hoens, Abeles, Conant & Danzis,* attorneys).

*Richard E. Shapiro,* Director, Division of Public Interest Advocacy, argued the cause for *amicus curiae* Public Advocate (*Thomas S. Smith,* Acting Public Advocate, attorney).

*Denise Reinhardt* submitted briefs on behalf of *amicus curiae* New Jersey Coalition on Civil Rights Enforcement (*Reinhardt & Schachter,* attorneys).

*Tanya E. Pushnack* submitted a letter brief on behalf of *amicus curiae* Princeton Undergraduates for Co–Educated Eating Clubs (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

*Joan Pransky* submitted a brief on behalf of *amici curiae* American Jewish Congress, Anti–Defamation League of B'nai B'rith and Community Relations Committee of the United Jewish Federation of MetroWest (*Joan Pransky,* attorney; *Joan Pransky* and *Jeremy S. Garber,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns whether the New Jersey Division on Civil Rights (Division) followed the proper administrative procedure in concluding that it had jurisdiction under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42 (LAD), over the Tiger Inn and Ivy Club (Clubs), all-male eating Clubs at Princeton University. Central to the resolution of the jurisdictional issue is whether the Clubs are "places of accommodation" within the meaning of LAD, or are exempt from LAD because they are "distinctly private." The Division found that the Clubs have an integral relationship of mutual benefit with

Princeton which deprives them of private status and makes them subject to the Division's jurisdiction. Whether the Clubs are "distinctly private" or have lost claim to private status by their association with Princeton University is initially a factual issue. The Clubs assert that material facts remain in dispute on this issue and hence, they should have been afforded a plenary hearing before the Division determined that it had jurisdiction. The Division and plaintiff assert that there are no material facts in dispute relevant to the issue of jurisdiction.

The procedural record discloses that the parties had numerous hearings before the Division and the Office of Administrative Law at which time they presented their factual contentions and legal arguments. The Appellate Division also reviewed this case twice. Based on our examination of the record, we find that this procedure accorded the parties their administrative due process rights. Moreover, we conclude that there are no disputed facts that are material to the jurisdictional issue; hence, the Division properly invoked its jurisdiction. We also conclude that the Division properly found that the clubs discriminated against plaintiff on the basis of her gender and affirm the Division's remedies against the Clubs.

I

A. *Procedural History Up To The Division's Finding of Probable Cause.*

This case has a protracted history. Plaintiff, Sally Frank was a student in Princeton in 1979 when she commenced the action. She since has graduated from Princeton, finished Law School, and is now counsel of record in this case. The record consists of 31 volumes, comprising nearly 6,000 pages.

The saga began in February, 1979 when Frank filed a complaint with the Division against Princeton and three male-only eating clubs associated with Princeton, namely, Ivy Club, Univ-

ersity Cottage Club[1] and Tiger Inn, alleging that they had discriminated against her on the basis of her gender in violation of LAD. The Division refused to process that complaint.

In November of 1979 Frank filed another complaint, again alleging gender discrimination by the same parties. This complaint asserted that the Clubs were "public accommodations" because the Clubs functioned as "arms of Princeton. * * * " and because they were public accommodations in their own right. The Club filed answers denying that they were places of public accommodation and denying that they functioned as arms of Princeton. They claimed they were "bona fide private clubs" and therefore exempt from jurisdiction under *N.J.S.A.* 10:5–5*l.* Princeton filed an answer denying that it was a place of public accommodation "with respect to the eating and social activities of its students." Princeton also claimed that as a factual matter, the Clubs were not part of the University.

The Civil Rights Division dismissed Frank's complaints. The Appellate Division, emphasizing that it was taking no position of the merits, vacated the Division's order because of the Division's failure to make findings of fact and to grant a hearing, and remanded the matter to the Division for further proceedings consistent with its opinion. 228 *N.J.Super.* 40, 548 *A.*2d 1142.

The Division moved for reconsideration and for a clarification of the requirements of the remand. In its motion the Division advised the court of the procedure it intended to follow on remand:

> In the absence of further guidance from the Court in this case, the Division would propose initially to hold a fact-finding conference in order to determine which, if any, of the mass of facts collected by the Division are actually in dispute, and whether there are further facts which the parties wish to bring to the Division's attention. Thereafter, if there were disputed issues of material fact, it would be appropriate to hold a plenary contested case hearing to determine jurisdiction. *If there are no material facts in dispute, the Division*

---

[1]Cottage settled with Sally Frank and was dismissed from the case. It agreed to admit women members.

*would issue a determination of jurisdiction containing appropriate findings of fact and conclusion of law, with further proceedings to be held if the Division has jurisdiction.* As previously indicated, however, the Division is of course willing to follow whatever procedures the Court mandates. (Emphasis added).

The Appellate Division denied the Motion for Reconsideration, without any guidance as to what procedure should be followed. The Division, therefore, followed the procedure outlined in its motion.

Shortly after the Motion to Reconsider was denied, James Sincaglia, Chief of the Bureau of Enforcement for the Division, brought the parties together to begin the fact-finding process. Frank served interrogatories on the Clubs and Princeton. The University responded by making hundreds of pages of documents available for inspection and copying to all parties. Many of these documents were then submitted to the Division. The Clubs served interrogatories on Frank. The parties also exchanged lists of proposed stipulations and each side noted on the other's list those stipulations that were acceptable and those that were disputed.

The Chief held two day-long fact-finding conferences in March and April, 1984. During the conferences the Chief lead the attorneys through the lists, noting those facts to which everyone agreed to stipulate and conducting a painstaking discussion on those facts disputed by the parties. In addition, the parties introduced documents, presented unsworn testimony, cross-examined witnesses and presented both oral and written legal arguments. The Chief accepted only documents that the parties agreed were authentic.

After the two-day conference hearings, the record was kept open until April 30, 1984 to allow the parties to submit additional documents. On May 31, 1984, the parties were served with the Chief's formulation of the stipulations discussed at the Conference (Accepted Stipulations and the Chief's Rulings). In his letter the Chief stated that "your review of these rulings will demonstrate that sufficient evidence existed in the record

to issue Findings on the disputed stipulations. Therefore, no material facts remain in dispute. You will be expected to raise any objections to the stipulations and rulings not previously proffered within ten days."

The stipulations fell into three categories:

(1) Stipulations accepted as proposed;

(2) Stipulations not accepted as proposed but resolved by the Division on the basis of evidence (mostly documentary) submitted by the parties; and

(3) Stipulations neither accepted nor rejected because they required legal conclusions of the kind that would be made by the Division upon review of the entire record.

The vast majority of the stipulations were accepted as proposed. Of 39 stipulations proposed by Sally Frank, 29 were accepted. Eight fell into the second category and two fell into the third category. The Clubs submitted 191 stipulations. 180 were accepted, ten fell into the second category and one required resolution by the Division upon review of the entire record. Thus, over 200 stipulations were accepted as proposed. It is the eighteen stipulations that fell into the second category of stipulations—those disputed by the parties but resolved by the Chief on the basis of documentary evidence, unsworn witness testimony and discussions at the Conference that give rise to the controversy underlying this appeal.

The parties filed comments and objections to the Chief's proposed rulings. The entire record was then transferred to the Director. The parties submitted briefs to the Director wherein Ivy and Cottage wrote "[n]ow after nearly 12 months of supplemental investigation, this matter is being submitted to the Director of the Division on Civil Rights for a final ruling as to whether jurisdiction exists." Tiger acknowledged that its brief was being submitted "on the sole issue raised by this proceeding: Whether the Division has jurisdiction over Tiger under the Law Against Discrimination."

The Division issued a "Finding of Probable Cause" on May 14, 1985 (the "Finding"). The Finding established that the Division had jurisdiction over the Clubs and that probable cause existed to believe that the Clubs had discriminated against women. The bulk of the document was dedicated to a discussion of jurisdiction. At the beginning of the jurisdiction portion of the Finding, "Undisputed facts" are set forth, extracted from Stipulations submitted and agreed to by the parties and from documents submitted by them. Authenticity of the documents is not in dispute.

B. *Facts Derived From the Division's Finding of Probable Cause*

Princeton University is a private, non-sectarian institution of higher education, founded in 1746. The University is located in Princeton, New Jersey. From 1746 to 1968, Princeton University admitted only male students as undergraduates. In 1969, the University for the first time admitted women as undergraduate degree candidates.

From approximately 1803 to 1843, Princeton University required all undergraduate students to take their meals in commons operated by the college steward. In 1843, Princeton permitted its undergraduate students to board off-campus. The Princeton college refectory burned down in 1856 and was closed for fifty years. During that time, all students took their meals in boarding houses that were not affiliated with the college. In the mid–1800's several groups of Princeton students formed "select associations" to reduce the cost of their off campus living and dining expenses. By 1876 twenty five "select associations" or eating clubs were in existence.

The club system associated with Princeton University, which began with these "select associations," presently [sic] consists of thirteen clubs, eight of which are non-selective clubs and five of which are selective clubs. Campus, Charter, Cloister Inn, Colonial, Dial Lodge, Elm, Quadrangle and Terrace are the eight non-selective clubs. These clubs, formerly all male and

selective, are now co-ed. The non-selective clubs offer social, recreational and dining activities.

Admission to the non-selective or open clubs is by a lottery system. Students who are not accepted into the "open clubs" of their choice are given the opportunity to go through subsequent lottery rounds at any "open club" that has additional available contracts to offer.

The five selective clubs are Ivy, Cottage, Tiger Inn, Cap & Gown and Tower. The selective clubs also offer social, recreation and dining activities. Tower, Cap & Gown and Cottage accept male and female members. From their inception until the present, Ivy and Tiger have only accepted male members.

Ivy was found in 1879. During its 110 years it has occupied four different clubhouses, all of which it either owned or rented independently of Princeton University. It now owns the land and clubhouse at 143 Prospect Street in Princeton and pays all of its local and state taxes, maintenance, utility and insurance costs. Ivy is incorporated in New Jersey, tax-exempt under the Internal Revenue Code and at one time had a liquor license. It is supervised by a Board of Governors. It has 3 classes of membership: honorary, graduate and undergraduate.

As of 1984, Ivy had 1,500 graduate members, 79 undergraduate members and 39 sophomores who accepted bids. Ivy's Constitution does not require that the Club's membership be restricted to men. Tiger was founded in 1890. Its history parallels that of the Ivy. Its membership rules and constitution are also similar to Ivy's.

Membership in the selective clubs is presently by invitation only. The general public is not invited to join Tiger or Ivy. Bicker is the term the five selective Clubs use for the process of interviewing and selecting new members. The sophomore class at one time administered Bicker, but ceased doing so in 1978. Since 1978, the sophomore class has not provided direct funding for the Bicker process. The process is now totally funded by the individual Clubs.

Since at least 1977, there has been a fall and spring Bicker. Spring Bicker has taken place in late January to early February. Fall Bicker is an optional activity for selective clubs and is usually restricted to seniors. Two purposes of fall Bicker are to fill section sizes to their optimal level and provide new members with an introduction to the Bicker process.

The Clubs administer fall Bicker entirely. The Committee on Bicker Administration (CBA), made up of students, presently coordinates spring Bicker. The CBA has, in the past, used University office space to coordinate its week-long Bicker effort. At one time the University assessed no rental charge, but does so now.

The Bicker process is divided into steps: (1) registration; (2) Bicker sessions; (3) bid sessions, and (4) sign-in. Since at least 1977, Bicker sessions consist of visits made by the Bickerees to each of the selective clubs, and are held every night. The primary purpose of Bicker sessions is to give Club members the opportunity to individually evaluate the Bickerees as prospective Club members.

A bid session is a meeting of the Club members to decide which Bickerees will be invited to join a selective eating Club. A bid is an invitation to join one of the selective Clubs. There is not a set number of bids that each Club is required to offer, and the process whereby Bickerees are extended invitations to join varies from Club to Club. Since at least 1977, after each Bicker session, members of Tiger Inn and Ivy have submitted written comments to their Bicker chairman about each Bickeree with whom they had significant contact. These confidential comments are read at bid sessions.

Undergraduate members of Ivy are elected by consensus at a meeting of a majority of its current membership. Tiger Inn requires unanimous agreement of its undergraduate members for a sophomore to be admitted. Cap & Gown, Cottage and Tower require a ⅔ majority vote of their memberships for a sophomore to be admitted. In 1984, 114 sophomores completed

Bicker at Ivy: 40 received bids and 19 accepted their bids. At Cottage Club, 107 sophomores completed Bicker: 72 received bids and 69 accepted. At Tiger Inn, 112 sophomores completed Bicker: 91 received bids and 70 accepted. Cap & Gown had 114 sophomores who completed Bicker: 85 received bids and 70 bids were accepted. At Tower, 106 sophomores completed Bicker: 71 received bids and 69 bids were accepted.

The Clubs require their undergraduate members to pay an initiation fee together with a yearly fee for board and social activities. All fees are paid by the student directly to the clubs. These fees are not part of Princeton University's undergraduate tuition. Membership dues and contributions to Ivy and Tiger are not tax deductible as contributions to educational institutions. Respondent Clubs provide food for consumption on their premises by contract with club members, the club agreeing to provide specific meals to their members for specific sums. All the Clubs charge members who bring a guest to dinner for the guest's meal unless the guest holds a University dining contract, and both the club member and the guest uses the Meal Exchange Program.

Respondent Clubs at times have paid for and placed announcements in *The Daily Princetonian* which advertise Bicker, open-house-events and parties. The Clubs are rented out from time to time to club members or their relatives for private non-club functions which are attended by non-members. Employees of the Clubs are not employees of Princeton University. Employees of the clubs are not covered by University-provided benefits such as health insurance, pension plans or Social Security contributions.

The Clubs use zip code 08540. Zip code 08544 is only used by Princeton University. Respondent clubs do not have campus mail delivery, nor can they use Princeton University's non-profit mailing permit.

Princeton University requires all freshman and sophomore students to have University dining contracts. Princeton Univ-

ersity juniors and seniors generally dine in one of the following ways (figures are for 1983–84): DS (dining service) contracts (191); club membership (1570); living off-campus (98); living in Spelman Hall, apartment-style with kitchens (156); living at 2 Dickinson Street and participating in the co-op there (20); and living in other upperclass residential halls and eating in an undetermined manner (194).

Adlai Stevenson Hall is a University-operated facility consisting of two buildings at 83 and 91 Prospect Street. It was originally founded in 1970 after the University purchased the facilities of Court and Key & Seal Clubs, both now defunct. Any junior or senior may hold a meal contract at Stevenson Hall. In addition, a limited number of juniors and seniors may hold a meal contract at each of the residential colleges. Some of these are "Resident Advisors," appointed to counsel freshmen and sophomores. Others are selected through a "college lottery" system, under which a small number of upperclassmen are allowed to continue to reside in the residential college where they resided as underclassmen.

The Club system has consistently been the most popular eating option available to upperclass students. In school year 1983–84, 1570 out of 2230 of Princeton's juniors and seniors took meals at one of the eating clubs.

Three meal-exchange programs exist between the University food services and Respondent Clubs. The general Meal Exchange Program allows students to dine with their friends at other facilities at no additional cost. The Program is administered, and all costs are jointly shared, by the Inter-club Council and the University's Department of Food Services. The general Meal Exchange Program works as follows: if a Club member invites a Princeton student having a University dining contract to a meal at his club as his guest, and the guest reciprocates and invites the club member to dinner at a University dining facility within one calendar month, neither party will be charged for the guest's meal. If no reciprocal meal is ex-

changed within one month, the sponsor will be charged for the guest's meal by his Club or the University.

The Upperclass Choice Meal Exchange provides sophomore class members with the opportunity to eat in facilities they may select for their junior year without the expenditure of additional funds. The meal exchange operates during the fall from the first Monday of November through the first Thursday in December. The precise dates are established by the Upper Class Choice Committee and the University Department of Food Services. The program is for dinner meals, typically Monday through Thursday. The Department of Food Services reimburses the individual clubs per dinner meal for contract-holders who participate in the program.

The Sophomore Club Meal Participation Program allows sophomores who are new members to dine at a club during the spring semester of their sophomore year. The University reimburses the Club a percentage of the University food costs for the meal. At Ivy, the sophomore member is charged the difference between the University's reimbursement and the club's charge for the meal.

University proctors are not responsible for the security at Tiger Inn or Ivy and do not regularly patrol the Clubs' grounds or premises. Princeton University students involved in off-campus altercations are subject to discipline by the University. Princeton University has no authority to discipline a graduate member of Tiger or Ivy for objectionable conduct by that graduate member on the club's premises. Tiger and Ivy discipline their own members for disturbances connected with the clubs regardless of whether any action was taken by public or University authorities.

From at least 1977, Tiger and Ivy have not been listed as officially recognized student organizations by the Dean of Students of Princeton University. Princeton University does not presently provide any assistance to Tiger or Ivy in their fundraising efforts. However, the Princeton University Alumni

Records and Mailing Services ("ARMS") makes certain services available to University alumni, including supplying updated mailing lists and processing mailings. There is a single rate-sheet for all such services, applicable to the eating clubs and to other outside organizations. Tiger and Ivy have used some of these services.

A review of documents submitted from the late 1960's and mid–1970's give some indications of the relationship between Princeton University and the Clubs during two time frames— just prior to the admission of women to Princeton University in 1969, and just prior to Sally Frank's admission to Princeton in 1976. In 1967, as part of the Minutes of the May 1, University Faculty Meeting, an Interim Report of the Subcommittee of the Faculty Committee on Undergraduate Life described the relationship between the University and the Clubs as follows:

The University itself provides no dining facilities for most upperclassmen but sanctions the private eating clubs as virtually the only dining and recreational facilities regularly made available to approximately ninety per cent of the upperclassmen. There are not alternatives in suburban Princeton or in the Wilson Society that could accommodate a large percentage of those undergraduates.

Once considered tangibly "off" campus, the clubs are now visibly "on" it, surrounded [by many campus buildings]. Yet the University does not own the clubs or their land, and it does not manage their operations or purchase their supplies. * * * The quality of the food, the physical facilities, and the activities vary from club to club.

The University's responsibility for the utilization of the clubs by the undergraduates is revealed in many ways. Resolutions of the Trustees have established their jurisdiction over undergraduate membership in the clubs. A week's recess is allowed in the University calendar each year for Bicker. Information on Bicker is provided for sophomores with the assistance of the office of the Dean of Students, who exercise some supervision over the proceedings. Conduct of the undergraduate members within clubs is regulated by the University under the Gentleman's Agreement which delegates responsibility for enforcing its provisions largely to the undergraduate members and the officers of the individual clubs, under the supervision of the Undergraduate Inter-club Committee. University regulations govern the board payment of scholarship students, and the University endorses an agreement that protects the financial stability of the clubs as a group by limiting the size of the membership in any one of them. The University Health Services are implementing their proposal for the inspection of club kitchens. Intramural sports for upperclassmen are organized on the basis of the clubs (and the Woodrow Wilson Society).

In sum, the University and the clubs are now mutually dependent on each other. The clubs depend on the University for an annual supply of undergraduates that virtually insures the continuance of the system; the University depends on the clubs for dining and recreational facilities. In the past, the University has exercised its responsibility for providing these facilities to upperclassmen largely by delegating it, with a minimum of surveillance and a minimum of initiative to improve the clubs. [MINUTES OF THE UNIVERSITY FACULTY MEETING OF MAY 1, 1967].

In 1973, the University proposed to the Clubs a jointly-funded study of the club system by Haskins and Sells. The purpose of the Study was "to outline all of the options available to develop a system of operation that would be financially and socially viable to the Clubs and to the University." The study was proposed at a time when the Clubs were foundering financially due to a decline in membership. There was apprehension that some Clubs might go out of business.

The Haskins and Sells Study, released in April of 1975, set forth a long list of options for dealing with the problems facing the Club system. These options fell into three general categories: options requiring University policy changes, options involving only the Clubs; and options requiring ongoing University involvement with the Clubs.

By October 23, 1975, the University took short-term actions to assist the Clubs, which included help in the collection of overdue accounts and planning for Club participation in the freshman orientation program. Other actions taken by the University within the next year included:

(1) Adoption of the Board of Trustees resolution "reaffirming the University's view that the Club system provides an important social option for undergraduates and expressing again the sense of the Board that this form of social alternative should continue to be available."

(2) The Office of the Dean of Student Affairs assisted the clubs in collecting overdue bills from their members.

(3) The new student handbook included a description of the Club system.

(4) Arrangements were made for a presentation of the clubs to be a part of the freshman orientation. This proved to be a successful tactic in improving membership.

(5) Assistance was provided to the clubs for snow removal from their front sidewalks by University personnel.

Sally Frank was a student at Princeton University from September 1976 through June 1980, when she graduated. During that time, Sally Frank did not join any of the non-selective eating clubs. During spring 1979 Bicker, Sally Frank was permitted to Bicker at the Ivy Club. However, Ivy's president told her that she could speak to Ivy members only when there were no sophomore men waiting to speak to Ivy members. Sally Frank spoke to at least one Club member at each of the Bicker sessions. She did not receive a bid from Ivy. During spring 1979 Bicker, Sally Frank Bickered at Tower Club and Cap & Gown. She did not receive a bid. During Bicker of 1980, Tiger Inn, Cottage and Ivy refused to permit Sally Frank to Bicker.

From these facts, the Division issued eleven factual conclusions. The Clubs essentially agree that the Division's Finding of Probable Cause was based only on stipulated facts. Their dispute is that the Division's factual conclusions are unjustified by those undisputed facts. The factual conclusions follow:

1. A Club system provides dining facilities for a majority of upperclass students attending Princeton University.

2. Respondent Clubs are part of this Club system associated with Princeton University.

3. Princeton University relies on these Clubs to feed a majority of their upperclass students.

4. Without the Clubs, Princeton University would incur substantial costs and would have to make major changes in the provision of dining services for upperclass students.

5. Princeton University has an interest in the continued viability of the Club system and has taken actions based on that interest.

6. The Clubs are characterized by the Clubs and Princeton University as servicing Princeton students and recruit members almost exclusively from Princeton University.

7. The Clubs work with one another and with Princeton University through organizations like the C.B.A. and the Interclub Council.

8. The link that ties the individual Clubs together is their association with Princeton University.

9. The Clubs would not continue in their present form with Princeton University.

10. Princeton University and the Clubs are integrally connected in a mutually beneficially relationship.

11. Non-members of respondent Clubs, particularly but not exclusively, Princeton University students, can participate in many of the respondent Clubs' activities and use the respondent Clubs' facilities.

The Division concluded based on these facts that the relationship between the Clubs and Princeton University is one of integral connection and mutual benefit that negates the Clubs claims that they are "distinctly private" entities. The Division rejected the argument that the Club members' constitutional free-association rights would be violated if the Clubs were subject to LAD. The Division then discussed briefly the issue of discrimination. On the basis of undisputed facts, the Division determined that probable cause existed to believe that the Clubs discriminated on the basis of gender.

C. *Procedural History After Division's Finding of Probable Cause.*

After the Finding of Probable Cause was issued, Frank requested that the matter be transferred to the Office of Administrative Law (OAL). In July 1985, the case was filed as a "contested case" at OAL. Sally Frank moved for Partial Summary Decision on the issue of jurisdiction. The Clubs opposed the motion. The ALJ requested the parties to advise him of any material facts in dispute. The Clubs submitted no affidavits to the ALJ other than a certification of attorneys for Ivy, which recited only the procedural history of the proceedings before the Division. The parties placed before the ALJ the agreed stipulations of fact and a list of the documents which had been submitted in evidence before the Division. Both Ivy and Tiger also submitted briefs in response to Frank's motion. Those briefs, however, recited very few alleged material facts in dispute. The only facts specifically alleged to be in dispute were the selectivity of the hat bid procedure, the existence of an Inter-club agreement, and the extent to which club facilities are available to the general public. In response, Frank pointed out that the Clubs had failed to identify material facts in dispute and had failed to identify any specific document that they claimed was irrelevant.

Based on the submissions before him, the ALJ granted Frank's motion and, on December 12, 1985, filed an Initial Decision granting Partial Summary Decision on the jurisdictional issue. The ALJ's decision was based on a determination that the Division's Finding should be construed as the final agency determination on the issue of jurisdiction. This determination was based on two factors. First, the ALJ found that the Division had intended its finding of jurisdiction (as opposed to the finding of probable cause on discrimination) to be final. Second, the ALJ considered the determination of jurisdiction to be the "law of the case" because (1) the finding of jurisdiction had been "careful, thorough and comprehensive;" (2) the procedure had been fair; (3) the legal analysis had been extensive, cogent, well-reasoned and persuasive; and (4) the re-determination of the issue would be "duplicative, repetitious, time-consuming and wasteful." The ALJ also found there were no material facts in dispute and that the facts that the Clubs alleged were disputed had been found to be immaterial. For example, the ALJ clarified that the Inter–Club Agreement was not admitted for its truthfulness but to show that ties existed between the respondent Clubs, the other Clubs and Princeton.

After giving notice that she would do so and receiving exceptions but no affidavit in support of those exceptions, the Director on February 16, 1986, issued an Order of Partial Summary Decision on jurisdiction which adopted the recommendations of the ALJ. The Director's Order of Partial Summary Judgment stated that "after a careful review of the materials submitted to ALJ Miller and the exceptions filed by the clubs," the Director found "[n]o *genuine* issue of *material* fact remain[ing] in dispute." Because no material facts were in dispute the Director found that a full hearing on jurisdiction at OAL would be "duplicative, repetitious, time consuming and wasteful."

In support of her finding that no full hearing would be required, the Director reviewed the Clubs' opportunity to demonstrate to the ALJ what facts were allegedly in dispute, and

the fact that the Clubs had submitted no affidavits in support of their assertions that there existed disputes concerning material issues of fact. The Director also noted that the two documents claimed by the Clubs to be inaccurate were party-admissions by Princeton University, then a Respondent, and that the Clubs had submitted no evidence to contest these documents. The Director also addressed fully the Clubs' arguments concerning facts alleged to be in dispute. The Director deemed the existence of an Inter-club agreement to be immaterial in light of the undisputed facts that the agreement was published in a University booklet and that unsigned copies were available at the Dean's office. Even assuming no agreement was ever executed, the University held the agreement out to the students as existing. This, not the actual execution, was the importance of the agreement." The Director also noted that although the Clubs alleged that there were disputes of fact concerning the hat-bid and the availability of public access to the clubs, her conclusions concerning those issues were drawn either from stipulations or from the testimony of the Clubs' own witnesses and affidavits submitted by the Clubs.

The Director also pointed out that the Clubs' dispute over certain conclusions in the jurisdictional finding did not raise issues of material fact but rather were simply disputes over conclusions drawn from undisputed facts. Examples of such conclusions include the finding that Princeton University and the clubs are "integrally connected" and that there was a significant relationship between the University and the Clubs. The Director also noted that the Clubs had failed to point to any evidence that could be introduced at a hearing that would raise a dispute concerning these conclusions. Finally, the Director observed that the Clubs had had at least three opportunities to place before the Director any evidence that they wished to have her consider and to demonstrate that there were material issues of fact in dispute. The Director concluded that the clubs had failed to "demonstrate ... further facts or evidence that could be introduced to justify or necessitate a full hearing."

The Director then addressed the Clubs' argument that "regardless of the process implemented by the Division on Civil Rights, they [were] entitled to a full hearing at the Office of Administrative Law based on the Administrative Procedure Act, the guarantees of due process and fundamental fairness and the Appellate Division Decision remanding the case to the Division." Relying on *Cunningham v. Civil Service Comm'n*, 69 *N.J.* 13, 350 *A*.2d 58 (1975), the Director noted that the Clubs were "entitled to a hearing only [sic] if they made an offer of proof supported by an affidavit to show genuine issues as to any material fact." Since no material facts were shown to be in dispute, the Director concluded, "the Clubs were given all they were entitled to—'the opportunity to present argument orally or in writing * * *.'" On the basis of the foregoing, the Director affirmed the finding of jurisdiction and remanded the matter to the ALJ for further proceedings on the issues of liability and remedy.

The University Cottage Club settled with Frank on February 24, 1986. The ALJ issued an Initial Decision on liability on June 16, 1986, granting Frank's Motion for Partial Summary Decision. He ruled that liability existed with regard to the two Clubs on the basis of undisputed facts. Summary decision was not proper with regard to Princeton, however, because more information was necessary to address the issue of what constituted the alleged "aiding and abetting" discrimination by Princeton. On July 22, 1986, Frank and Princeton entered into a Stipulation and Order of Partial Settlement. Princeton continued to participate in the proceedings because of the potential involvement it would have in whatever remedies were ultimately ordered by the Division.

On July 28, 1986, the Director adopted the ALJ's Initial Decision of Partial Summary Decision on liability respecting the two clubs. The Director found the claims against Princeton were moot based on the settlement agreement between Frank and Princeton. There was no appeal from that determination. The Order remanded the matter back to the OAL for further

proceedings on damages and remedies to be afforded Frank. Following that remand, the ALJ conducted plenary hearings for six days between July 29 and August 6, 1986, during which sworn testimony, subject to cross-examination, and additional documents were admitted as evidence.

On January 29, 1987, the ALJ issued his Initial Decision on the issue of damages and remedies. His decision proposed the following remedies:

(a) that Ms. Frank be awarded $2,500 in compensatory damages by the two Clubs;

(b) that Ms. Frank *not* be awarded membership in either club;

(c) that the two Clubs should sever certain ties to Princeton in order to attain 'distinctly private' status under *N.J.S.A.* 10:5–5(*l*);

(d) that Princeton should avoid reference to the two Clubs as being affiliated or connected with the University in all future publications.

On May 26, 1987, the Director issued the Final Administrative Decision and Order, which adopted the ALJ's recommendation denying club membership to Frank, increased the award of humiliation damages to $5,000 and rejected the ALJ's recommendation that the Clubs be ordered to sever their ties with Princeton instead of ordering them to admit women. The Director found that such a result was neither possible nor desirable and "that in any event ordering the clubs to sever the ties instead of ceasing their discriminatory practices was counter to the purpose of LAD." The Director entered a cease and desist order directing the clubs to admit women as members.[2]

---

2Both clubs recently voted to end their policy of not admitting women. In order for the policy change to become final, however, each club will need to confirm its vote within one year of the initial vote and then each club's graduate board consisting of alumni must approve the policy change.

Ivy and Tiger appealed to the Appellate Division. The Appellate Division partially reversed the Division and remanded the case to the Division for new proceedings. The court rejected the Clubs' contention that they had a right to a hearing *before* the Division made its threshold determination of probable cause. The court likewise rejected the contention that the fact-finding conference should have been conducted by the Director herself and not by the Chief of the Enforcement Bureau.

The court based its reversal, however, on the fact that the Chief had exceeded his authority by resolving disputed facts and that the Division, by relying on the facts as resolved by the Chief, had abused its discretion. Thus, according to the Appellate Division, the Division had bootstrapped disputed facts into undisputed facts and then relied on those facts in coming to its conclusions. Accordingly, the Appellate Division found that there were material facts in dispute concerning the jurisdictional issue. Hence, the Clubs were entitled to a plenary hearing on the question of jurisdiction. The Appellate Division, therefore, reversed the finding of jurisdiction and probable cause, vacated the order of remedies, and remanded the case to the Division with instructions to forward the case to the OAL to conduct a trial-type hearing on the issues of (1) jurisdiction, (2) discrimination and (3) remedy.

Sally Frank then petitioned this Court for certification, arguing that the Appellate Division failed to defer to the Division's substantively correct and procedurally fair decision, designed to eradicate a particularly offensive form of discrimination, and that failure to correct the Appellate Division's erroneous decision to remand will result in significant individual and societal harm.

After first considering the matter, we remanded the case to the Appellate Division, specifically "for the limited purpose of clarifying [Appellate Division] opinion to indicate what material

facts remain in dispute, the determination of which is essential to a meritorious disposition of the case ..."

The Appellate Division filed a *per curiam* opinion stating that "all unstipulated facts, documents and other evidence are material and remain in dispute and must be resolved in a trial-type hearing before there can be a disposition of the case on the merits." We granted certification, 117 *N.J.* 627, 569 *A.*2d 1330 (1989).

## II

### A. *Necessity of Plenary Hearing*

It is well-established that where no disputed issues of material fact exist, an administrative agency need not hold an evidential hearing in a contested case. *Cunningham v. Dept. of Civil Service*, 69 *N.J.* 13, 24–25, 350 *A.*2d 58 (1975). The mere existence of disputed facts is not conclusive. An agency must grant a plenary hearing only if *material* disputed adjudicative facts exist. *Bally Mfg. Corp. v. Casino Control Com'n*, 85 *N.J.* 325, 334, 426 *A.*2d 1000 (1981), app. dis. 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *Cunningham v. Dept. of Civil Service*, 69 *N.J.* at 24–25, 350 *A.*2d 58. *N.J.S.A.* 52:14B–9. The key issue therefore is whether any material facts remained in dispute when the Director made her final decision. Based on an examination of the record we find that no material facts in dispute exist with respect to the issue of jurisdiction and that the administrative procedures followed fully comported with administrative due process.

The procedural history discloses that this is not a case where the parties did not have a hearing or an opportunity to present their evidence and legal positions. The parties had a two-day fact-finding conference. While testimony at the fact-finding conference was unsworn, parties were allowed to present and cross-examine witnesses, introduce documents and question and

examine the documents. Indeed, the conference resulted in 200 factual stipulations.

Moreover, *N.J.A.C.* 1:1–12.5(b) provides in relevant part:

When a motion for summary decision is made and supported, an adverse party in order to prevail must by responding affidavit set forth specific facts showing that there is a genuine issue which can only be determined in an evidentiary proceeding.

*Cunningham v. Civil Service, supra,* 69 *N.J.* at 25, 350 *A.*2d 58 (party opposing summary disposition motion must submit affidavits to support claim that material facts are in dispute). The procedural history discloses that the Clubs had several opportunities specifically to submit affidavits setting forth the material facts in dispute to the Chief, the Director and the ALJ. The record discloses that the Clubs made minimal efforts to identify allegedly disputed facts and submitted no affidavits in response to Frank's motion for partial summary judgment.

The major disputes between the parties on the jurisdictional issue all relate to the fact-finding conference and the Division's Finding of Probable Cause. Specifically:

1. Whether the Clubs were led into a "trap" that the Fact-Finding Conference could result in the resolution of the jurisdictional issue;

2. Whether Chief Sincaglia's resolution of eighteen disputed facts were relied on by the Division in its jurisdictional decision; and

3. Whether there are any material facts in issue relevant to the jurisdictional issue.

## B. *The Fact Finding Conference*

■ First, we reject the Clubs' assertion that they were ignorant of the possibility that the results of the fact-finding conference would determine jurisdiction. 228 *N.J.Super.* at 61, 548 *A.*2d 1142. The Division repeatedly assured all of the parties that the fact-finding conference was intended to produce a binding determination on the issue of jurisdiction.

The first mention of the fact-finding conference occurs in the Division's petition for rehearing. In that petition, the Division proposed the fact-finding conference as the procedure it would employ in the first instance. In that proposal, the Division clearly stated that the fact-finding conference would lead to a "determination of jurisdiction" if no material facts were in dispute.

This proposal was restated in subsequent letters to the parties advising them of the procedure. In a letter dated October 5, 1983, the Director advised the parties that

> [a]s indicated herein, the purpose of the Fact–Finding Conference is to make a preliminary determination as to whether there are material facts in dispute. In the event that there exists [sic] genuine issues of material fact, the Division will conduct a public hearing to resolve the disputed issues. The parties will then be required to submit proposed findings of fact and conclusion [sic] and thereafter the Director will issue a decision as to jurisdiction.

In a letter to Sally Frank dated October 26, 1983, with copies to all parties, the Director again set out the purpose of the Conference:

> [t]he Fact–Finding Conference hopefully will resolve the jurisdictional issue in this case. * * * If jurisdiction is found to exist, there will be an additional conference regarding the probable cause issue. * * * In the event that the Fact–Finding Conference does not resolve the issue of jurisdiction, I will again review the matter for possible submission to a hearing.

If there was some confusion about the scope of the Conference it only galvanized the parties to investigate thoroughly the potential ramifications of this fact-finding process. All of the parties wrote to the Division requesting clarification of the procedure and its possible effect. Interrogatories were circulated to help generate a universe of stipulation facts and those interrogatories were, themselves, the subject of some confusion. The Clubs were not alone in their concern about the extent of protection to be afforded by the procedure. Frank wrote to the Chief to express her belief that she was not waiving any right to a hearing by participating in the conference. Despite some uncertainty about these unusual proceedings, discovery lumbered forward through the winter of 1983 and 1984. During that time, the Division steadfastly main-

tained its position that the Conference, while somewhat informal, could resolve the issue of jurisdiction if, when it was done, no relevant material facts remained in dispute. For example, in a letter from the Chief to Frank, copies of which were sent to all parties, the Chief expressed his opinion that the issue of jurisdiction would be resolved by undisputed facts adduced at the Conference:

I must repeat that in compliance with the decision of the Appellate Division, the Division on Civil Rights will conduct a fact finding conference to determine which material facts remain in dispute and to permit the parties to bring additional information to the attention of the Director.

If there are disputed issues of material fact it would then be appropriate to conduct a plenary hearing. See *Cunningham v. Department of Civil Service*, 69 *N.J.* 13, 19–24 [350 *A.*2d 58] (1975).

Given that the bulk of the facts in this case should be undisputed, I am optimistic that all of the material facts will be resolved at the fact-finding conference.

However, participation in the conference will not prejudice your right to a hearing if appropriate.

*See also* letter of October 26, 1983 from the Director to Princeton's attorney. ("The Fact Finding Conference * * * will be solely for the purpose of determining jurisdiction over the Clubs * * * ").

The Fact–Finding Conferences were held on March 12, and on April 3, 1984. At the outset Chief Sincaglia reminded the parties that the Conference would resolve the jurisdictional issue if no material fact disputes arose:

[T]he fact finding conference will make a preliminary determination as [sic] whether there are facts that are disputed, genuine issue of fact. To resolve the disputed issue, [sic] the parties will then be required to produce findings of fact and conclusions of law, and thereafter the director will issue a decision as to jurisdiction. *If there are no material facts and disputes at the end of the fact finding conference,* * * * you will issue proposed findings of fact and conclusions of law to me. Then the director will issue the findings as to jurisdiction. (emphasis added).

Thus, the parties were reminded several times that the Conference might prove conclusive. Moreover, the attorney for the Clubs explicitly acknowledged that she understood that the fact-finding conference was going to settle the issue of Division jurisdiction.

Uncertainty about the nature and effect of the Conference seems to have made the parties especially cautious. Far from lulling them into a false sense of security, this unfamiliar procedure heightened the parties' caution. The letters seeking clarification from the Division indicate that the Clubs' and the University were acutely aware that the jurisdictional question might be resolved on the facts adduced at the Conference.

### C. *Materiality of Facts*

In analyzing the materiality of the facts, it is critical to understand that the Division rejected the theory that the Clubs themselves were places of accommodation. Instead, the Division premised its conclusion that the Clubs were not distinctly private on its finding that "the relationship between the Clubs and Princeton University is one of integral connection and mutual benefit." Jurisdiction over the Clubs is, essentially, based on jurisdiction over Princeton and supported by undisputed facts of the present day interdependence of the Clubs and Princeton. There no longer is any question that Princeton is a place of public accommodation under LAD. *Peper v. Trustees of Princeton University,* 77 *N.J.* 55, 67–68, 389 *A.*2d 465 (1978).

In reaching its determination that the Clubs lacked a distinctly private character because of their close connection with the University, the Division relied on three principles. First, claims that a club is distinctly private require close scrutiny by the Division and the courts. All facts must be carefully reviewed so that "[no] device, whether innocent or subtly purposeful, can be permitted to frustrate the legislative determination to prevent discrimination." *Clover Hill Swimming Club v. Goldsboro,* 47 *N.J.* 25, 34, 219 *A.*2d 161 (1966) (quoting *Jones v. Haridor Realty Corp.,* 37 *N.J.* 384, 396, 181 *A.*2d 481 (1962)).

Next, the Division relied on "a significant body of authority supporting the proposition that associations that ordinarily would be exempt from laws applying to public or commercial enterprises will lose that exemption if they alter their purely

private character in some significant manner." (quoting *Franklin v. Order of United Commercial Travelers*, 590 *F.Supp.* 255, 260 (D.Mass.1984). The Division noted that one significant form of alteration is "a close association with a non-exempt organization or institution." (citations omitted).

The third principle is that the Division must "deal with the substance, rather than the form of transactions, and not permit important legislative policies to be defeated by artifices affecting legal consequences of the existing situation." (quoting *United States v. Beach Associates, Inc.*, 286 *F.Supp.* 801, 807 (D.Md.1968).

Applying these principles to the facts, the Division gave little weight to the Clubs' present financial and legal independence from the University. Neither did it rely heavily on evidence of historical connections between the Clubs and the University. Instead, the Division drew from undisputed facts demonstrating that "the University and the Clubs are in reality integrally connected." Specifically, the Division relied upon three factual conclusions in coming to its determination:

(1) The Clubs are held out as part of a club system which serves Princeton students;

(2) The Clubs draw their membership almost exclusively from Princeton University students; and

(3) Princeton relies on the club system to feed a majority of its upperclass students.

Each of the three factual conclusions is based entirely upon undisputed facts adduced at the Fact–Finding Conference.

The Clubs agree that the Director's Finding of probable cause is based on undisputed facts. The Clubs' dissatisfaction with the Directors' jurisdictional decision stems from the fact that the Director did not focus on the assiduously maintained legal separateness of the Clubs. Instead, the Division relied on the "gestalt" of the relationship between the University and the Clubs.

The finding of an integral and symbiotic relationship is based on the undisputed factual conclusions that the Clubs need the University and the University needs the Clubs, rather than on any particular act of control or integration. Where a place of public accommodation and an organization that deems itself private share a symbiotic relationship, particularly where the allegedly "private" entity supplies an essential service which is not provided by the public accommodation, the servicing entity loses its private character and becomes subject to laws against discrimination. *Hebard v. Basking Ridge Volunteer Fire Company*, 164 *N.J.Super.* 77, 395 *A.*2d 870 (App.Div.1978), *cert. den.* 81 *N.J.* 294, 405 *A.*2d 838 (1979) (volunteer fire department that refused to admit women had sufficient ties to municipality to make it subject to LAD); *Franklin v. Order of United Commercial Travelers*, 590 *F.Supp.* 255 (D.Mass.1984) (fraternal benefit society is not exempt from State anti-discrimination law because its relationship to city's police department deprives it of private status); *Adams v. Miami Police Benevolent Ass'n*, 454 *F.*2d 1315 (5th Cir.1972) *cert. den.*, 409 *U.S.* 843, 93 *S.Ct.* 42, 34 *L.Ed.*2d 82 (1972) (an association held subject to anti-discrimination law based on connection to city's police department, a non-exempt body). It would be disingeneous for the Clubs to assert that they could ever exist apart from Princeton University. The Clubs gather their membership from Princeton and, in turn, provide the service of feeding Princeton students. Because of this, the Clubs lack the distinctly private nature that would exempt them from LAD.

The Division's conclusion that the Clubs are not distinctly private is based on undisputed evidence. The eighteen disputed facts are immaterial to the Director's analysis because they pertain primarily to whether the Clubs are private or public places of accommodation in their own right. Other facts are immaterial because they demonstrate either formalistic historical connections or the technical, legalistic independence of the clubs, rather than the present-day functional interdependence of the Clubs and Princeton.

### D. *Eighteen Disputed Facts*

We believe that the Division's legal reasoning was sound and that the Clubs are subject to LAD based on the undisputed evidence concerning their interdependent relationship. Nonetheless, since the basis on which the Appellate Division remanded this case was that Chief Sincaglia improperly resolved 18 disputed stipulations, we will briefly analyze the disputed stipulations.

1. THE FIRST EIGHT STIPULATIONS PROPOSED BY FRANK

STIPULATION # 3 The Division holds that Princeton University, a private, nonsectarian institution of higher education, is a place of public accommodation as defined by *N.J.S.A.* 10:5–1, *et seq.*

Determination of this fact requires legal analysis, not a trial type hearing. *Peper v. Trustees of Princeton University, supra,* 77 *N.J.* at 67–68, 389 *A.*2d 465 (Princeton is a place of public accommodation).

STIPULATION # 11 The record herein does not support the proposal that the all-male clubs regularly advertise their parties at other schools. The record does indicate, however, that students from other schools are made aware of and attend functions at the all-male clubs.

As acknowledged by counsel for Tiger Inn at the Conference, this stipulation was irrelevant. The stipulation tends to show that the Clubs were, in some sense, open to the public. The Division's jurisdictional finding, however, was not based on a determination that the Clubs were places of public accommodation in their own right but that the Clubs are subject to the LAD because they are involved in a relationship of integral connection and mutual benefit with Princeton University.

Stipulations # 14 through # 18 relate to the historical connection between Princeton and the Clubs. Stipulation # 14 relates to the origin of the Clubs. Stipulation # 15 deals with the historical existence of University-faculty oversight of the Clubs' operations. Stipulation # 16 relates to faculty participation in the selection of Club members at some time in the past. Stipulations # 17 and # 18 have to do with the disputed, but in any case discontinued, involvement of the Dean's office in setting the dates for club membership selection. *See also*

Stipulation # 61, *infra,* at 108, 576 A.2d at 259 (stating that historically, Princeton has had some degree of involvement in formulating rules for Bicker). Even though all of these stipulations go to the issue of a relationship between the Clubs and the University, none of them is material to the finding of jurisdiction. The "historical" component common to all of these stipulations makes them unnecessary to the Division's analysis. The Division's analysis goes exclusively to actual, i.e., current, not historical, indicia of interdependence. The existence or absence of formal connections between the University and the Clubs of the type demonstrated by the disputed stipulations 14–18 and 61 is thus immaterial to the analysis undertaken by the Division and, under the legal standards employed, no resolution of these disputes could affect the outcome of this litigation.

> STIPULATION # 19 provides that: The record herein indicates that an "inter-club Agreement" exists between the "clubs" and Princeton University which at least in part intends to regulate the behavior of "club" members and their guests on the "clubs" premises.

The Inter-club Agreement is a document that was, at some point, proposed but never adopted as a way of setting standards for Club member conduct. This document was discussed at some length at the Conference. It is undisputed that although it was never adopted by the Clubs, the document somehow found its way into the possession of Princeton University authorities and was then excerpted in the Princeton University student handbook, *Rights Rules and Responsibilities* (1982 ed.). Counsel for Princeton admitted at the Conference that the inclusion of excerpts from the non-existent document was an error because no such agreement existed.

The following reference was made to the Inter-club Agreement in the Undisputed Facts section of the Division's Finding of Probable Cause:

> The pamphlet *Rights, Rules and Responsibilities,* is published by Princeton University and sets forth Princeton University's disciplinary rules and procedures governing student behavior. The 1982 pamphlet included a specific section entitled "Conduct at Prospect Street Clubs" [*Rights, Rules and Responsibilities* at 26]. The regulations in that section are said to be based on the Interclub Agreement. The section presents excerpts from the terms of the

> Interclub Agreement, an agreement which establishes a cooperative arrangement for discipline of undergraduate students who violate standards of conduct. The "standards of behavior at individual clubs are to conform with established standards in the University as a whole. In particular, club members are to act with considerate regard for the rights, privileges, and sensibilities of others. It is expected that they will show due consideration for the property of their fellow members and guests, as well as for the property of the club itself. Physical violence, intimidation of others, or offensive and disorderly behavior will not be tolerated, in any club, or on the walks and streets outside the clubs" [*Rights, Rules and Responsibilities* at 26].

This description seems erroneously to accept the fact in dispute: the existence of an Inter-club agreement. The next question is what effect that erroneous statement of fact had on the finding of jurisdiction.

The Director listed three factors central to the finding that the Clubs and the University are integrally related, among them, that the Clubs "are held out as part of a Club system which services Princeton University students." The facts cited to support that factual conclusion relate solely to the fact that the "University publications present the clubs as a dining alternative for upperclass students. * * * [H]aving an eating club contract allows for an integration with the University dining facilities through the general meal exchange program." This factual conclusion therefore does not rely on facts tending to show that an Inter-club agreement regarding discipline was in effect.

The immateriality of the improper resolution of this disputed stipulation is reinforced by the reference made to it by the ALJ in his Initial Decision to grant a Partial Summary Decision on the issue of jurisdiction:

> Respondents allege the existence of a dispute with respect to the following: an alleged Inter-Club Agreement, the nature of the 'hat bid' procedure, and the use of club facilities by members of the public. The Director, however, has made clear in her Finding of Probable Cause that these matters were not significant in reaching her decision. Similarly, for purposes of the pending Motion any such dispute is irrelevant.

In summary, we find that stipulation # 19, although improperly and erroneously resolved and repeated in the statement of facts of the Finding of Probable Cause, formed no material part

of the Director's ultimate determination that jurisdiction existed, based on the relationship between the Clubs and the University, existed.

2. THE NEXT TEN STIPULATIONS WERE PROPOSED BY THE CLUBS

STIPULATION # 53 The record herein indicates that while each "club" devises its own rules for Bicker, these rules are influenced by Princeton University's rules and regulations.

 The Finding of Probable Cause does not rely on this stipulation. The stipulation relates to the type of formalistic ties that formed no part of the finding of jurisdiction. The finding on jurisdiction is based on the symbiotic relationship that exists between the Clubs and the University. The University provides the students; the Clubs feed them. Formalistic discussion of rule derivations is immaterial to this analysis.

As previously mentioned, Stipulation # 61 is a historical fact, immaterial to the finding of jurisdiction.

STIPULATION # 110 The record herein indicates that Princeton University assumes some oversight responsibilities with respect to the conduct of the members of the all-male clubs.

 The discussion of this stipulation at the Conference was minimal. The stipulation is immaterial to the decision on jurisdiction, which was based on the functional interdependence of the Clubs and the University rather than questions of discipline. Moreover, the stipulation is correct and supported by other stipulations. During the discussion of the Inter–Club Agreement, counsel for Tiger agreed that a student who violated the Code of Conduct of Princeton would be subject to discipline by a joint committee, which includes the Dean of Student Affairs, no matter where the violation occurred. According to stipulation # 22, to which there is no opposition by the Clubs, Club officers have been disciplined by the University for Club members' behavior, although it is no longer University policy to do so. According to undisputed stipulation # 133, Princeton disciplines students involved in off-campus altercations. Presumably, this includes altercations that occur at Clubs.

STIPULATION # 111 The record herein indicates that the activities of the all-male clubs are conducted for the benefit of their members, not the public.

The only dispute over this stipulation was Frank's objection to the use of the word "public." The stipulation, as resolved, rejects Frank's theory and is generally favorable to the Clubs.

> STIPULATION # 112 The record herein indicates that the all-male clubs do not always limit the use of the facilities and services of their clubs to their members in good standing and their guests.

This stipulation appears to be true. There was undisputed testimony by Gordon K. Harrison, Club Manager for several clubs, including Tiger, that during the fall term, "sophomores are able to visit clubs to sample the meals ..." when deciding what clubs to join even though they are not personally invited by a member. This indicates that the clubs do not always limit the use of their facilities to members and their guests. Beyond the veracity of this stipulation, however, is the issue of whether it is relevant.

This stipulation goes to the non-essential issue of whether the Clubs are places of public accommodation in their own right, and is irrelevant to the crucial determination that the Clubs are subject to the jurisdiction of the Division on Civil Rights because they had altered their distinctly private nature by means of their connection with Princeton University.

Stipulations 118, 121, 122 and 127 were all resolved in the Club's favor. Disputed Stipulation is 171 irrelevant to the type of analysis employed by the Division and also is not really disputed.

> STIPULATION # 171 The record herein indicates that when Princeton snow-plows travel between University facilities located at the opposite ends of Prospect Avenue, they often clear the public right-of-way (sidewalks) in front of Ivy, Cottage, and Tiger Inn without the all-male clubs' permission.

The only dispute to which this stipulation seems to relate is whether the Clubs had ever requested snow-plowing, or the degree of relationship between the Clubs and the University that is demonstrated by the plowing. In fact, there was documentary evidence indicating that a decision to plow in front of the Clubs was made by the University, specifically to help the

Clubs during times of financial hardship. In addition, stipulation # 159, *proposed* by Tiger Inn and *accepted* by Frank, acknowledges that snow-plowing on Club property occurs and is not paid for by Tiger Inn. If the dispute over this stipulation was improperly resolved, it was resolved in the Clubs' favor in a way that accorded precisely with the testimony of the Club managers, called as witnesses for the Clubs. Moreover, this stipulation has nothing to do with the analysis employed by the Director in its Finding on jurisdiction.

## III

The Clubs and Princeton, which is undisputably subject to LAD, have an integral relationship of mutual benefit. The relationship between the Clubs and Princeton can be derived entirely from the undisputed facts regarding the present functional interdependence between the Clubs and the University. There are no disputed facts material to the jurisdictional issue. Therefore, no plenary hearing was necessary before the Division properly asserted jurisdiction over the Clubs.

We also find that the undisputed facts establish that the Clubs and Princeton have an interdependent relationship that deprives the Clubs of private status and makes them subject to the Division's jurisdiction.

Gender discrimination is contrary to the legislative policy of the State of New Jersey. "The eradication of 'the cancer of discrimination' has long been one of our State's highest priorities." *Dixon v. Rutgers, The State University of N.J.,* 110 *N.J.* 432, 451, 541 *A.*2d 1046 (1988), quoting from *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (1988). *See also Peper v. Princeton, supra,* 77 *N.J.* at 80, 389 *A.*2d 465. The Legislature enacted LAD to reflect the belief that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions of a free democratic state." *N.J.S.A.* 10:5–3. The elimination of discrimination in educational institutions is particularly critical. *Dixon v. Rut-*

*gers, The State University of N.J., supra,* 110 *N.J.* at 452–53, 541 *A.*2d 1046. The intent of the legislature to eliminate discrimination in educational institutions is evidenced by the designation in *N.J.S.A.* 10:5–5(*l* ), as a "place of accommodation," of any "college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." *See also Hebard v. Basking Ridge Fire Company, supra,* 164 *N.J.Super.* 77, 395 *A.*2d 870; *Clover Hill Swimming Club v. Goldsboro,* 47 *N.J.* 25, 219 *A.*2d 161 (1966); *Nat. Org. for Women v. Little League Baseball,* 127 *N.J.Super.* 522, 318 *A.*2d 33 (App.Div.1974).

 The Clubs have fiercely contested the threshold issue of jurisdiction because, once jurisdiction is established, there is no question that the Clubs discriminated against women. It is undisputed that the Clubs had a general policy that excluded females from consideration as members. It is also undisputed that the Clubs applied this policy to Frank when she attempted to Bicker at the clubs. That policy constituted discrimination in violation of LAD. On the basis of the facts in this record, we agree with the Division that the Clubs cannot sever their ties to the University or remove themselves from the jurisdiction of the Division. Instead, the Clubs must obey this State's substantive legal proscriptions against discrimination and discontinue their practice of excluding women purely on the basis of gender.

We reverse the Appellate Division and reinstate the Order of the Division on Civil Rights dated May 26, 1987.

CLIFFORD and O'HERN, JJ., concurring in judgment.

We agree with the Court's ultimate conclusions that (1) there was no necessity for the Division on Civil Rights to have conducted a plenary hearing before exercising jurisdiction over the all-male eating clubs, (2) the eating clubs' special relationship with Princeton University deprived those clubs of exempt

status as "distinctly private" social organizations under this State's statutory law guaranteeing civil rights, *N.J.S.A.* 10:5-1 to -42, and (3) the clubs' by-laws and policies against admission of women violated this State's substantive law. We therefore concur in the judgment.

*Concurring in result*—Justices CLIFFORD and O'HERN.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.