The IVY CLUB

v.

W. Cary EDWARDS; Pamela S. Poff, Appellants,

Sally Frank, Intervenor–Defendant.

Sally FRANK, Counter–Claimant,

v.

The IVY CLUB, Counter–Defendant.

No. 90–6027.

United States Court of Appeals, Third Circuit.

Argued May 9, 1991.

Decided Aug. 21, 1991.

As Amended Sept. 4, 1991.

Rehearing Denied Sept. 16, 1991.

Robert J. Del Tufo, Atty. Gen. of New Jersey, Andrea M. Silkowitz, Asst. Atty. Gen., Jeffrey C. Burstein (argued), William H. Lorentz, Deputy Attys. Gen., Div. of Law, Newark, N.J., for appellants.

Barbara Strapp Nelson (argued), McCarthy and Schatzman, P.A., Princeton, N.J., for appellee, The Ivy Club.

Nadine Taub (argued), Rutgers Women's Rights Litigation Clinic, Newark, N.J., for appellee, Sally Frank.

Sally Frank, pro se.

Before MANSMANN, NYGAARD and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal, the procedural posture of which has all of the trappings of a law school examination question, requires us to explore the boundaries of the several theories under which the federal courts abstain from exercising their jurisdiction in deference to comity with the state courts. Specifically, the question presented is whether a party, who files a claim in federal court following a state administrative agency's determination that the federal constitution does not preclude the agency's exercise of jurisdiction, may return to federal court to litigate its federal claims after the completion of the state court proceedings in which it specifically refrains from raising its federal claims.

The Ivy Club ("Ivy" or "Club"), a social eating organization whose membership is drawn primarily from the student body of Princeton University, filed suit in the United States District Court for the District of New Jersey alleging that the exercise of jurisdiction by the New Jersey Division on Civil Rights, Department of Law and Public Safety (the "Division") violated its first amendment rights to freedom of association and its constitutionally guaranteed right to privacy. Following the federal court's stay of the federal suit, Ivy returned to the state court proceedings, but thereafter refrained from litigating its federal claims.

Upon termination of the state court proceedings, the district court reopened this case and, pursuant to 28 U.S.C. § 1292(b), certified to this court the order granting Ivy's motion to reopen its section 1983 action. We affirm the district court's order permitting Ivy to reopen the case because we hold that Ivy, in the unique circumstances we have here, sufficiently reserved its right to litigate its federal claims in federal court.

## I.

Ivy, founded more than a century ago, is a social eating club with an active membership of less than eighty undergraduate students at Princeton University and approximately fifteen hundred inactive graduate members who formerly attended the University. The Club is one of thirteen eating clubs which provide meals to a portion of upper class Princeton students. Until recently, Ivy's membership was all male.

This litigation commenced in 1979 when Sally Frank, then a student at Princeton University, filed a complaint with the Division[1] against Ivy, as well as two other eating clubs, the Tiger Inn and the University Cottage Club ("the Clubs"), and Princeton University. Frank alleged that the Clubs and Princeton University discriminated on the basis of sex in places of public accommodation in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1 et seq.

The Division initially refused to process Frank's complaint, stating that it had determined that the Clubs were exempt from

---

1. New Jersey created the Division on Civil Rights in the Department of Law and Public Safety to prevent and eliminate discrimination in the manner prohibited by the Law Against Discrimination; it gave the Division general jurisdiction and authority for such purposes. N.J.S.A. 10:5–6.

LAD because the Clubs were not places of public accommodation. LAD does not apply to "any institution, bona fide club, or place of accommodation, which is in its nature distinctly private." N.J.S.A. 10:5–5(1).

In December of 1979, Frank filed another complaint with the Division, this time alleging that the Clubs were places of public accommodations because they functioned as an arm of Princeton University. Ivy's answer to the complaint stated as a separate defense that Ivy "has the right to freedom of association pursuant to the First and Fourteenth Amendments of the United States Constitution." The Division dismissed Frank's complaint, holding that it lacked jurisdiction over the Clubs because of their distinctly private nature.

Frank appealed the dismissal of her complaint to the Appellate Division of the Superior Court of New Jersey. Once again, the Clubs raised the defense of freedom of association guaranteed by the United States Constitution. The appellate division, taking no position on the merits of the complaint, vacated the decision by the Division and remanded the case for further investigation, holding that a hearing and factual findings were necessary to determine whether the Division had jurisdiction.

After a number of procedural skirmishes not relevant to the dispute at hand,[2] on February 6, 1986, the Division issued a Partial Summary Decision, holding that the Division had jurisdiction over the Clubs. The decision affirmed an earlier ruling of the Division in which the Director of the Division rejected the Club's argument that the exercise of jurisdiction by the Division violated their first amendment right to freedom of association. In a discussion covering six pages, the Director compared the Clubs and *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and held that the application of LAD to the Clubs did not violate their constitutional right to freedom of association.

On February 13, 1986, following this final determination of jurisdiction at the administrative level, and having had its constitutional defenses against the exercise of jurisdiction rejected, Ivy and the Tiger Inn filed suit in federal court.[3] The complaint alleged that the exercise of jurisdiction by the Division of Civil Rights violated the Clubs' civil rights under the federal constitution and requested a declaratory judgment and an injunction against the state proceedings. The defendants were Attorney General W. Cary Edwards and Director of Civil Rights Pamela Poff. *Tiger Inn v. Edwards*, 636 F.Supp. 787 (D.N.J.1986).

The federal court chose to stay the federal action "until the New Jersey courts have clarified the application of the New Jersey Law Against Discrimination to the plaintiffs." *Tiger Inn*, 636 F.Supp. at 792. Although the plaintiffs requested the court to exercise its equitable powers in restraining the state proceedings, the court stayed the action pursuant to the *Pullman* doctrine, rather than the *Younger* doctrine.[4] The court explicitly declined to rule whether the plaintiffs were entitled to return to federal court upon the conclusion of the state proceedings. The court cautioned Ivy and Tiger Inn "not to interpret the court's decision to grant a stay as a ruling that they have properly reserved their federal constitutional claims for federal court adjudication pursuant to *England*." [5] 636 F.Supp. at 792.

**2.** See *Frank v. Ivy Club*, 120 N.J. 73, 576 A.2d 241 *cert. denied, Tiger Inn v. Frank*, — U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991), for a complete review of the procedural history at the state level.

**3.** The University Cottage Club settled with Frank on February 24, 1986. On July 22, 1986, Frank also settled with Princeton University. Princeton continued to participate in the proceedings because of the potential involvement it would have in whatever remedies were ultimately ordered by the Division.

**4.** *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**5.** *See England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

The Ivy Club and Tiger Inn then resumed litigation at the state level. Ivy thereafter refrained from raising its federal constitutional claims in the state proceedings. It explicitly stated that it wished to reserve its right to litigate its federal claims in federal court pursuant to the *England* doctrine. Ivy reserved its rights under *England* orally before the Administrative Law Judge and again in its brief to the Appellate Division of the New Jersey Superior Court. As a part of its motion opposing certification to the Supreme Court of New Jersey, Ivy included its brief presented to the appellate division containing the *England* reservation. Tiger Inn, on the other hand, continued to present its federal claims in the state proceedings.

On July 3, 1990, the Supreme Court of New Jersey rendered its final decision. *See Frank v. Ivy Club*, 120 N.J. 73, 576 A.2d 241 (1990), *cert. denied, Tiger Inn v. Frank*, —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). The court affirmed the Division's Order of May 26, 1987, awarded Frank humiliation damages in the amount of $5,000, but denied her club membership. It also ordered Ivy and Tiger Inn to admit women as members.

The decision, concerned primarily with the extent of hearings necessary to satisfy administrative due process, did not discuss federal constitutional claims. The only mention the New Jersey Supreme Court made of any federal constitutional claims was in its *summary* of the procedural history where the court noted that "[t]he Division rejected the argument that the Club members' constitutional free-association rights would be violated if the Clubs were subject to LAD." 576 A.2d at 251.

On August 24, 1990, Ivy moved to reopen its federal action based on the 1986 complaint. On October 15, 1990, the district court reopened this case and certified the question to this court under 28 U.S.C.

§ 1292(b)[6] whether Ivy had waived its right to litigate its federal rights in federal court.

On October 1, 1990, Tiger Inn filed a Petition for a Writ of Certiorari with the Supreme Court of the United States, claiming that the decision of the Supreme Court of New Jersey violated its first amendment rights. Although Ivy filed a motion for an extension of time to file its petition in the Supreme Court, Ivy never filed a petition. On January 18, 1990 the United States Supreme Court denied Tiger's petition for certiorari.

## II.

### A. *Mootness*

■ In the fall of 1990, Ivy formally inducted its first female members. The admission of women to the club raises the threshold question of whether this matter is moot. As is well established under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. *Lewis v. Continental Bank Corporation*, 494 U.S. 472, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). This case-or-controversy requirement subsists through all stages of the judicial proceedings, trial and appellate. *Id.*

■ Because this court has jurisdiction pursuant to 28 U.S.C. § 1292(b), the scope of appellate review extends only to questions of law raised by the order certified by the district court, *United States v. Stanley*, 483 U.S. 669, 677, 107 S.Ct. 3054, 3060, 97 L.Ed.2d 550 (1987). However, it is the order that is appealable, and not the controlling question; and thus we may address any issue necessary to decide the appeal before us. *Morse/Diesel, Inc. v. Trinity Industries, Inc.*, 859 F.2d 242, 249 (2nd Cir.1988). We must necessarily decide the issue of mootness because this court has a " 'special obligation' to satisfy itself

---

6. 28 U.S.C. § 1292(b) provides that "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from

the order may materially advance the ultimate termination of the litigation, he shall so state in writing such an order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order...."

of its own jurisdiction in every appeal presented to it." *McNasby v. Crown Cork and Seal Co., Inc.*, 832 F.2d 47, 49 (3rd Cir.1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988), citing *Bender v. Williamsport Area School District*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).

Ivy's admission of women raises the question of whether the present controversy is mooted. Certainly, if Ivy admitted women in order to comply with the order affirmed by the New Jersey Supreme Court, and hence did so involuntarily, the matter would not be mooted. However, if Ivy members have freely and voluntarily decided to change their club policy, then we must consider the question of mootness.

Although Ivy admitted women only after the final decision of the New Jersey Supreme Court holding that Ivy must admit women, and after the state and federal courts denied Ivy's request for a stay, there are indications that at least part of Ivy's membership is in favor of admitting women. First, the club voted to admit women sometime prior to July of 1990, before the state court's final adjudication. *See Frank v. Ivy Club*, 576 A.2d at 253 n. 2. After the state court's final decision, Ivy members again voted to admit women. In light of the New Jersey Supreme Court's order that women be admitted, it would seem that holding a vote would be unnecessary as the outcome had been decided for them by the court.

There is therefore reason to believe that Ivy, regardless of the outcome of this litigation, has decided to revise its membership policy in favor of admitting women. If this were true, even if the court decided that Ivy does have a first amendment right to exclude women from their club, our decision would have no effect. Thus, the constitutional requirement of redressability would not be met; there must be a substantial likelihood that a favorable federal court decision will remedy the claimed injury. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

If Ivy does not intend to exercise the first amendment rights it alleges have been violated, a question that immediately comes to mind is why is Ivy pursuing this litigation. First, there might be internal disagreement within Ivy as to its admissions policy. Second, there exists practical, although not judicially cognizable, reasons for pursuing this federal litigation. The state court's order provides that Sally Frank may apply to the Director for attorneys' fees incurred in connection with this matter.

However, an interest in attorneys' fees does not save a matter from mootness. *Lewis v. Continental Bank*, 110 S.Ct. at 1255 (reasonable caution is needed to be sure that mooted litigation is not pressed forward solely to obtain reimbursements of attorneys' fees); *Diamond v. Charles*, 476 U.S. 54, 70–71, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986) (the fee award is wholly unrelated to the subject matter of the litigation, and the prospect that "continued adjudication would provide a remedy for an injury that is only a byproduct of the suit itself does not mean that the injury is cognizable under Article III").

In any event, we need not resolve the question whether Ivy admitted women voluntarily. Several other factors give considerable life to this controversy. First, the New Jersey Supreme Court upheld a $5,000 judgment against Ivy and Tiger Inn. If Ivy is correct in asserting that subjecting them to LAD violates its first amendment right to freedom of association, then a damage award based on violation of that law is impermissible. In addition, the Division has retained jurisdiction over the club to observe and require compliance with its orders that Ivy admit women in all future membership selections and that the women members will be accorded the same courtesies, privileges and accommodations as males. Ivy must also report in writing to the Division for the next two years on the number of women admitted. Under these circumstances, we conclude that the matter is not moot.

### B. *Ivy's Right to Litigate in Federal Court*

In 1986, Ivy and Tiger Inn filed suit in federal court seeking a declaratory judg-

ment and injunction against the state proceedings, alleging that the Division's exercise of jurisdiction violated the Clubs' civil rights in violation of 42 U.S.C. § 1983. *See Tiger Inn v. Edwards*, 636 F.Supp. 787 (D.N.J.1986). Because the plaintiffs requested that the federal court exercise its *equitable* powers to *restrain* ongoing state proceedings, the court should have decided the case under the parameters of the abstention doctrine laid out in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). However, at the State's urging, the court abstained pursuant to the *Pullman* abstention doctrine. *See Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The ramifications of that decision will be explored below.

Ivy and Tiger Inn's suit filed in federal court alleged that the defendants, Attorney General W. Cary Edwards and Director of Civil Rights Pamela Poff, were violating the clubs' right to privacy and freedom of association as protected by the first and fourteenth amendments. The Clubs brought suit pursuant to 42 U.S.C. § 1983 which provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, or any State ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Clubs alleged that the defendants' enforcement of the New Jersey Law Against Discrimination against them violated 42 U.S.C. § 1983 and requested that the defendants be enjoined permanently from implementing any procedures to compel the Clubs to accept any person into its membership against the associational preferences of its members.

Section 1983 has engendered a great deal of discussion regarding the relationship between the federal and state courts. Originally § 1 of the Civil Rights Act of 1871, section 1983 was "enacted for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment.'" *Mitchum v. Foster*, 407 U.S. 225, 238, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972) (quoting 17 Stat. 13). Section 1983 was intended to alter significantly the relationship of the federal government to the states.

The Civil Rights Act of 1871, together with the fourteenth amendment, were "crucial ingredients in the basic alteration in our federal system accomplished during the Reconstruction Era." *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 503, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172 (1982). The Act and the constitutional amendment had the effect of dramatically changing the relationship between the federal and state judicial systems. They threw open the doors of the federal judicial system to lawsuits by private citizens to enable them to protect their federal rights. As a consequence of the new structure of law that evolved in the post-Civil War era, "the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established." *Mitchum v. Foster*, 407 U.S. at 239, 92 S.Ct. at 2160. Section 1983 now offered a "uniquely federal remedy" for vindication of individual rights violated "under the claimed authority of state law." *Id.* at 239, 92 S.Ct. at 2160. It purposely interposed the federal courts between the States and the people "to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or *judicial.*'" *Id.* at 242, 92 S.Ct. at 2162 (quoting *Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676 (1880)) (emphasis supplied).

The Court has delineated the extent to which Section 1983 provides protection against involuntary participation in state court proceedings in *Mitchum v. Foster, supra*, and *Younger v. Harris, supra*, and its progeny. *Mitchum*, on the one hand, held that the federal anti-injunction statute, 28 U.S.C. § 2283, does not preclude a federal court from enjoining a state proceeding. The anti-injunction statute provides that a "court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by an Act of Congress, or where necessary in aid

of its jurisdiction, or to protect or to effectuate its judgments." The Court reasoned that section 1983 fell within the expressly authorized exception of the anti-injunction statute. *Mitchum*, 407 U.S. at 243, 92 S.Ct. at 2162.

*Younger* and its progeny, on the other hand, have erected a formidable prudential barrier to obtaining injunctive relief from ongoing state adjudicative proceedings. In *Younger*, the plaintiff, who was being prosecuted under the California Criminal Syndicalism Act, sought a federal court injunction pursuant to section 1983 against the state criminal prosecution on the grounds that the existence of the Act and the prosecution under it violated the first and fourteenth amendments. The Court refused to grant the injunction, citing concerns of comity and federalism.[7]  401 U.S. at 44–45, 91 S.Ct. at 750–51. The Court held that federal interference with state court proceedings was available only upon a showing of irreparable injury that is "both great and immediate." *Id.* at 46, 91 S.Ct. at 751.

██ Thus, although an injunction pursuant to section 1983 is not statutorily prohibited, *Younger* creates a separate and independent judicially created abstention doctrine.[8] The *Younger* abstention doctrine is a prudential limitation on the federal courts' exercise of jurisdiction when a plaintiff requests that a federal court interfere with ongoing state proceedings. Consequently, the Clubs' request for an injunction pursuant to 42 U.S.C. § 1983 fell squarely within the parameters of the *Younger* decision.

However, in 1986, when the district court considered the question of whether the Clubs' suit should be dismissed pursuant to *Younger*, the court expressed uncertainty as to whether *Younger* abstention should be applied to state administrative proceedings initiated by a private plaintiff. At that time, the Supreme Court had extended the *Younger* doctrine to civil proceedings initiated by the state in a state court in which important state interests were involved. *See Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). The Court had also applied *Younger* to state administrative proceedings initiated by the state in which important state interests were vindicated. *See Middlesex County Ethics Committee v. Garden State Bar Assoc.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

Only after the district court first considered this case in 1986 did the Supreme Court consider the question of whether *Younger* abstention applied to administrative proceedings initiated by a *private plaintiff*. In *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), a case factually similar to the one at bar, the state administrative proceedings were initiated by a private litigant filing a sex discrimination complaint with the Ohio Civil Rights Commission. Although the administrative proceedings were pending, Dayton (the defendant in the state proceedings), filed suit in federal court seeking an injunction against the state proceedings on the ground that any investigation or imposition of sanctions would violate the first amendment.

The Court held that it should abstain under *Younger* because "the elimination of

---

7. In another decision handed down the same day, *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Court held that *Younger* deference was also applicable to a suit seeking only a declaratory judgment that the statute under which the federal plaintiff was being prosecuted was unconstitutional. Thus, *Younger* applies regardless of whether the plaintiff seeks injunctive or declaratory relief.

8. Interestingly, *Mitchum* was decided after *Younger v. Harris*. The Court stated in *Mitchum*, 407 U.S. at 243, 92 S.Ct. at 2162, that it was not "question[ing] or qualify[ing] in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." The Court then made specific mention of *Younger* and its companion cases.

prohibited sex discrimination is a sufficiently important state interest to bring the present case within [*Younger* and its progeny]" and the Court had "no reason to doubt that Dayton will receive an adequate opportunity to raise its constitutional claims." 477 U.S. at 628, 106 S.Ct. at 2723. *Dayton* would thus appear to be controlling precedent for the case at bar. The present case also involves the issue of sex discrimination and there have been no allegations that the state courts would not provide an adequate opportunity to raise constitutional claims. Moreover, abstention in the present case might have avoided the necessity to reach a constitutional question. *Pennzoil Company v. Texaco, Inc.*, 481 U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987) (unwarranted determination of federal constitutional questions is a basis for abstaining pursuant to the *Younger* doctrine).[9]

Thus, in retrospect, with the additional guidance of *Dayton* and *Pennzoil*, it appears that abstention pursuant to the *Younger* doctrine would have been appropriate.[10] The defendants urge us to adopt this course of action presently and direct the dismissal of Ivy's action. However, fairness dictates that we must examine the circumstances under which the court in this case abstained and the effect of that decision on the litigants.

The district court, in deciding not to abstain pursuant to *Younger*, instead accepted the defendants' argument and abstained pursuant to the *Pullman* theory of abstention. *Tiger Inn v. Edwards*, 636 F.Supp. at 790. Persuaded that this case was a classic situation for *Pullman* abstention, the court decided to "stay the action until the New Jersey courts have clarified the application of the New Jersey Law Against Discrimination to the plaintiffs." *Id.* at 792.

The *Pullman* abstention doctrine derives from *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In that case, the Court established the principle that federal courts may abstain as a matter of policy from deciding a question of federal constitutional law when the challenged state law is unsettled and state resolution of the claim may make it unnecessary for a federal court to address the federal constitutional claim. Thus, under *Pullman*, a federal court may stay the federal proceedings until the completion of state court proceedings to decide an issue of state law which might moot a federal constitutional question.

*Pullman* abstention, however, is usually applied when a plaintiff properly invokes federal court jurisdiction *in the first instance* on a federal claim. *Allen v. McCurry*, 449 U.S. 90, 101 n. 17, 101 S.Ct. 411, 418 n. 17, 66 L.Ed.2d 308 (1980). When the plaintiff meets federal jurisdictional requirements and initiates proceedings in federal court prior to any state proceedings, the federal court has a duty to accept that jurisdiction. *Id.* The federal plaintiff is relegated to the state court only for the resolution of the state law issue. Unlike *Younger* abstention, *Pullman* abstention "may serve only to postpone, rather than to abdicate, jurisdiction." *Id.*

The impropriety of applying *Pullman* in the present case is illustrated by the Clubs' inability to file suit in federal court prior to the commencement of state proceedings. Their federal complaint was that the state administrative proceedings *themselves* violated their federal constitutional rights. Neither could the Clubs have removed their state action to federal court; a defendant sued in state court on a state law cause of action cannot remove a case from state to federal court because of a defense based on federal law.[11] *Louisville*

---

9. Commentators have criticized the *Pennzoil* decision as improperly blending *Pullman* and *Younger* abstention, *e.g.* Redish, Federal Jurisdiction 348 (1990).

10. The defendants acknowledge that the district court erred in not applying the *Younger* absten-

tion doctrine in the first instance. *See* dissent, at 286, n. 4.

11. Removal of an action would be possible only under the limited circumstances provided in the Civil Rights Removal Act, 28 U.S.C. § 1443, which is not in issue in this case.

*& Nashville R.R. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908) (A plaintiff's cause of action must be based on federal law in order for the case to arise under federal law for purposes of 28 U.S.C. § 1331.).

■■■ Thus, normally, unless an injunction could be obtained pursuant to the *Younger* doctrine, the state defendant in these circumstances would be constrained to present its constitutional defenses in state court. The Supreme Court has held that state-court judgments must be given both issue and claim preclusion effect to subsequent actions under 42 U.S.C. § 1983 by federal courts. *See Migra v. Warren City School District Board of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (Parties may not raise in federal court § 1983 litigation issues that *could have* been litigated in an earlier proceeding.); *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980) ("There is ... no reason to believe that Congress intended [§ 1983] to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue *already decided* in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.").

Thus, we see that Congress' intention that section 1983 "throw open the doors of the United States courts," *Patsy v. Florida Board of Regents*, 457 U.S. 496, 504, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172 (1982) (quoting remarks of Rep. Lowe), to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights does not hold true for the party who is a defendant in state proceedings alleging that the state proceedings are in violation of his federal rights. Unless the formidable barrier of the *Younger* abstention doctrine can be surmounted by a defendant in

a state proceeding or removal is available under the Civil Rights Removal Act, that defendant must have his federal rights adjudicated by the state court system subject to review only by the Supreme Court of the United States.

■■■ To summarize, the distinction between *Pullman* and *Younger* abstention arises from the different procedural posture of a case where the federal litigation is initiated as a defense to ongoing state proceedings and a case where the plaintiff properly invokes federal jurisdiction in the first instance.[12] In the former, the *Younger* doctrine is utilized when the federal court is requested to enjoin ongoing state proceedings. In the latter, the *Pullman* abstention doctrine is utilized when the plaintiff properly invokes the federal jurisdiction in the first instance and the federal court temporarily abstains from exercising its jurisdiction pending the state court decision on a state law question.

■■■ For our purposes, the most important consequence of district court abstention pursuant to *Younger* rather than *Pullman* is that although a decision under *Younger* terminates the federal litigation (or ends the state litigation if the federal plaintiff is successful), abstention under *Pullman* merely postpones the exercise of federal jurisdiction. *Allen v. McCurry*, 449 U.S. at 101 n. 17, 101 S.Ct. at 418 n. 17. A federal plaintiff who is remitted to state court pursuant to *Pullman* need not relinquish the right to litigate federal claims in federal court; that right may be reserved especially by following the dictates of *England v. Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

■■■ When the district court abstained pursuant to *Pullman*, the court expressly did not decide whether the Clubs were able to return to federal court following the

---

12. The Supreme Court noted this distinction in *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). In *Dayton*, the Court explained that the application of the *Younger* principle to pending state administrative proceedings was not inconsistent with *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), which holds that

litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court. The Court reasoned that in *Dayton*, unlike *Patsy*, the administrative proceedings were "*coercive rather than remedial, began before any substantial advancement in the federal action took place,* and involve[d] an important state interest." *Dayton*, 477 U.S. at 628 n. 2, 106 S.Ct. at 2723 n. 2 (emphasis supplied).

termination of the state court proceedings. The court, understandably troubled by Ivy's litigation of its federal constitutional claims in the state administrative proceedings, cautioned the Clubs "not to interpret the court's decision to grant a stay as a ruling that they have properly reserved their federal constitutional claims for federal court adjudication pursuant to *England.*" *Tiger Inn v. Edwards,* 636 F.Supp. at 792.

The record before us unequivocally demonstrates that Ivy's constitutional claims have not been adjudicated other than at the state administrative level. Subsequent to the district court's decision to abstain, Ivy refrained from litigating its federal constitutional claims. Ivy also expressly stated its wishes to preserve its right to litigate in federal court pursuant to *England* at each subsequent stage of the state court proceedings.

Moreover, the New Jersey courts appear to have acquiesced to Ivy's reservation of its right to litigate its federal claims in federal court. Although the New Jersey courts did not explicitly acknowledge Ivy's reservation under *England,* neither did the state court decide Ivy's constitutional defenses. *See Frank v. Ivy Club,* 228 N.J.Super. 40, 548 A.2d 1142 (1988); *Frank v. Ivy Club,* 120 N.J. 73, 576 A.2d 241 (1990). The only mention any state court made of Ivy's first amendment claims was the New Jersey Supreme Court's summary of the procedural history of the case. The court's recognition that the first amendment claim had been decided at the administrative level hardly constitutes the adjudication of Ivy's first amendment claims. The New Jersey Supreme Court affirmed only the order of the administrative body, not the Division's opinion containing the first amendment discussion issued in conjunction with that order.

We therefore are faced with the situation where confronted by a *Pullman* abstention, Ivy chose not to pursue its federal claims in the state court. The state court apparently had no objection to that reservation. Ivy, thus, has not had a full and fair opportunity to litigate its federal claims. The Supreme Court has repeatedly recognized that the collateral estoppel doctrine cannot be applied when a party did not have a "full and fair opportunity" to litigate an issue in the earlier proceeding. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1896–97, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. at 101, 101 S.Ct. at 418. Thus, the full faith and credit statute [13] does not bar the federal court's adjudication of Ivy's federal claims.

The defendants argued, however, that Ivy did indeed possess a full and fair opportunity to litigate its federal claims in state court and that Ivy voluntarily waived that right. The simple answer is that the court, having granted abstention specifically pursuant to *Pullman,* repeatedly put Ivy in a "catch–22" situation by not deciding the reservation issue at that time. If Ivy wished to return to federal court, Ivy had to refrain from presenting its federal claims at the state level. Under *England,* a party who freely and without reservation submits his federal claims for decision by the state courts waives the right to litigate its federal claims in federal court. *England,* 375 U.S. at 419, 84 S.Ct. at 467. Thus, if Ivy had any hope of benefitting from the court's decision to defer its exercise of jurisdiction rather than dismiss the case, Ivy necessarily had to refrain from litigating its federal issues in state court.[14]

We are therefore left with a balancing of the equities. Ivy, on the one hand, detrimentally relied on the district court's decision to stay this action. As a result, there has been no adjudication of Ivy's federal

---

13. The federal full faith and credit statute, 28 U.S.C. § 1738, provides that "judicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...."

14. We note that the parties could have sought a clarification of this issue on appeal. However, neither side did so and accordingly, we do not assess the failure to appeal as detrimental to either side.

claims to date. The State, on the other hand, has been litigating this case for over ten years and, had the State successfully presented the *Younger* abstention, it could have ended the litigation. We are less troubled, however, by any perceived unfairness to the defendants because of two factors: First, it was in response to the defendants' urging that the court abstained under *Pullman*. *Tiger Inn v. Edwards*, 636 F.Supp. at 789. Second, at least on the record before us, the defendants failed to raise any objection to Ivy's *England* reservations in the state court.[15] Accordingly, a sense of basic fairness dictates that Ivy be permitted to litigate its federal claims in the federal forum. Unreviewed state administrative proceedings cannot be considered a sufficient and fair opportunity to fully litigate Ivy's federal claims, the merits of which we do not reach.

The dissent disagrees with our holding that Ivy has been deprived of a full and fair opportunity to litigate its federal claims, arguing that this case should be treated as a straightforward *Pullman/England* case. The dissent would prefer that we ignore the procedural history of this case, stating that even if the *Pullman* abstention were incorrect, it has become "the law of the case." The law of the case argument, however, supports the majority view for it validates the exercise of equitable principles under the unique circumstances of this case. However, were we just to assume that the *Pullman* abstention was the "law of the case" and not discuss its inappropriate use in the situation we have here, nothing would discour-

age, or indeed, prevent future parties from relying on it as binding precedent.

The omission of any discussion of the impropriety of applying *Pullman/England* abstention in the present case could mislead future state court defendants into believing that they always have an opportunity to litigate their federal claims in federal court. According to the dissent, Ivy may not return to federal court to litigate its federal claims because it did not sufficiently reserve its *England* rights in the state administrative proceedings pertaining to jurisdiction. Following that argument to its logical conclusion, one would conclude that had Ivy only raised its *England* reservations from the moment it was summoned in the state administrative proceedings, Ivy could come into federal court to have its federal claims decided on the basis that Ivy had sufficiently reserved its rights under *England.*

Under the jurisprudence as it stands today, that is not the law. As we discuss *supra* at 280, federal courts must give state-court judgments both issue and claim preclusion effect in subsequent actions under section 1983. Section 1983 did not give state-court defendants the unrestricted right to litigate their federal rights in federal court. *See Allen v. McCurry*, 449 U.S. at 103, 101 S.Ct. at 419 (no authority for proposition that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in federal district court, regardless of the legal posture in which the federal claim arises). The state-court defendant may successfully invoke federal court jurisdic-

---

15. *Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064 (3rd Cir.1990), presented this court with an analogous situation. In *Bradley*, unlike Ivy, the plaintiff initiated state proceedings to have his state claims adjudicated after having filed his claim in federal court. In effect, the plaintiff "voluntarily" submitted himself to state court instead of having the federal court make the decision, the normal procedure under *Pullman*. Throughout the state proceedings, the plaintiff reserved his right to return to federal court pursuant to *England*. The court held that where (1) the plaintiff initiates an action in federal court, (2) the plaintiff appeals the termination of his employment through state prescribed procedures while explicitly reserving his

federal claim, (3) both the defendant and the state tribunal acquiesce in the reservation, and (4) the federal action is stayed pending the outcome of the state proceeding, the reservation of the plaintiff's federal claims for federal adjudication must be recognized. *Id.* at 1072.

Although *Bradley* is distinguishable from the case at bar in that the plaintiff filed first in federal court and did not have his federal claims adjudicated at the administrative level, *Bradley* does provide us with some guidance. *Bradley* demonstrates that in deciding whether an *England* reservation is valid, the actions of the other party and state court are relevant to the determination.

tion only if the defendant successfully amounts the *Younger* bar to obtaining an injunction of the state court proceedings or if removal is available pursuant to the Civil Rights Removal Act.

Notwithstanding, having sought injunctive relief immediately upon the final decision of the state administrative agency on the question of jurisdiction and having been the beneficiary of a *Pullman* abstention, although erroneously granted, Ivy should not be deprived of subsequent access to the federal court at the conclusion of the state court proceedings in which it refrained from litigating its federal claims. The dissent dismisses this proposition, stating that it is "without precedent." It is hardly surprising that no court has encountered the anomalous situation presented here. That no court has decided what should happen under these unique circumstances does not mean that we cannot, or should not, decide the case according to the dictates of justice. A court should not mechanistically apply precedent and when finding none to fit the case at bar, throw up its hands and state that the equitable issues may not be explored.

Rightly or wrongly, the district court retained jurisdiction in this case and did not preclude Ivy from returning to federal court. On the contrary, it held out the opportunity for Ivy to return. It is meaningless to retain jurisdiction just to rule at a later date that Ivy never had any right to return to federal court. Ivy's detrimental reliance on this judicial grant of jurisdiction resulted in a loss of its full and fair opportunity to litigate its federal claims in the state court.

In sum, to analyze the case as if it were a straightforward *England* case not only deprives Ivy of its full and fair opportunity to litigate its federal claims because of the district court's decision to retain jurisdiction, it also misleads future state court litigants to believe that if only they are more "effective" than was Ivy in making its *England* reservation, every state court defendant has a right to litigate its federal claims in federal court. We discussed the distinction between *Younger* and *Pullman*

abstention to illustrate that state defendants normally do not have the right to invoke a *Pullman* abstention.

■ We next turn to the question of whether the state proceedings should be given any preclusive effect at all. Normally, when the federal court abstains pursuant to *Pullman* and the federal litigant reserves his rights as required by *England*, issue preclusion applies only to the state law question decided by the state court. Upon return to federal court, the federal plaintiff may fully litigate his federal claims, including the factual issues that may be identical to those underlying the state law question. *England*, 375 U.S. at 417, 84 S.Ct. at 466 ("[I]n cases where, but for the application of the [*Pullman*] abstention doctrine, the primary fact determination would have been by the District Court, a litigant may not be unwillingly deprived of that determination.").

■ However, in the present case, the federal court will now hear Ivy's federal claims, not because Ivy was unwillingly subjected to the state court after properly invoking federal jurisdiction in the first instance, the normal *Pullman* situation, but because the application of *Pullman* abstention deprived Ivy of a full and fair opportunity to litigate its federal claims. The equitable considerations that require the federal court to decide Ivy's legal questions do not also require that Ivy be given a chance to relitigate the extensive factual findings of the state court.

The decision to give preclusive effect to the state court's factual findings eliminates any possibility of conflict with the Supreme Court's decision in *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). There the Court reasoned that Congress, in enacting the Reconstruction Civil Rights statutes, did not wish to foreclose the adaptation of traditional principles of preclusion. *Id.* at 797, 106 S.Ct. at 3225. The Court concluded that the conservation of judicial resources and the value of federalism are served by giving "preclusive effect to state administrative factfinding rather than leaving the courts of a second forum, state or federal,

free to reach conflicting results." *Id.* at 799, 106 S.Ct. at 3226.

The New Jersey Supreme Court's decision in this matter, *Frank v. Ivy Club*, 120 N.J. 73, 576 A.2d 241 (1990), makes it unnecessary to remand to the district court to decide the preclusive effect to which the Division's fact-finding would be entitled in state court. The parties will be bound by the undisputed stipulations of fact. The parties, however, will not be bound by the eighteen disputed facts determined to be immaterial by the state court. The state court did not decide whether procedural due process was satisfied as to the resolution of these eighteen facts; thus, the parties cannot be bound by them. *See Id.*, 120 N.J. 104, 576 A.2d at 257. Of course, the parties are not precluded from presenting additional evidence pertinent to the resolution of the federal claims.

▆▆▆▆ The dissent also argues that Ivy's litigation in federal court is barred by the *Rooker–Feldman* doctrine and the Full Faith and Credit Statute, 28 U.S.C. § 1738. However, these barriers apply to *state court* decisions, as opposed to state administrative decisions. *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983) ("United States District Court has no authority to review final judgments of a state *court* in judicial proceedings.") [16] (emphasis supplied); *University of Tennessee v. Elliott*, 478 U.S. at 794, 106 S.Ct. at 3223 (28 U.S.C. § 1738 is not applicable to the unreviewed state administrative proceedings). As noted earlier, the New Jersey state courts implicitly observed Ivy's *England* reservation and accordingly did not decide Ivy's federal constitutional claims. [17] Thus, *University of Tennessee v. Elliott*, which addresses the preclusive effect of unreviewed

state administrative decisions, is more to the point and permits review here by the district court. As already noted, *Elliott* holds that in section 1983 actions, federal courts must give the state administrative agency's fact-finding the same preclusive effect to which it would be entitled in the state's courts. *Id.* 478 U.S. at 799, 106 S.Ct. at 3226.

As the dissent recognizes, the district court only certified the question of whether Ivy had properly reserved its section 1983 claims under *England*. There was no need to certify the *Rooker–Feldman* question because if Ivy has rights under *Pullman/England, Rooker–Feldman* is irrelevant. "If Ivy made valid reservations ..., then the district court would have jurisdiction to hear these claims irrespective of the *Rooker–Feldman* doctrine." Dissent, at 293, n. 18.

III.

In sum, in response to the question certified to this court, we hold that in the face of the *Pullman* abstention exercised by the district court followed by Ivy's reliance on that abstention in the reservation of its right to litigate federal claims in federal court and not present them in the state proceedings, Ivy has neither waived nor had a full and fair opportunity to litigate its federal claims. Accordingly, we will affirm the district court's order permitting Ivy to litigate its section 1983 action in federal court.

NYGAARD, Circuit Judge, concurring and dissenting.

I respectfully concur in part and dissent in part. I agree with the majority's opinion that this case is not moot, but I disagree with its *England* analysis. [1] I conclude

---

**16.** When a United States district court is assessing the validity of a rule promulgated in a state non-judicial proceeding, it has subject matter jurisdiction because this does "not require review of a *final state-court judgment* in a particular case." *Feldman*, 460 U.S. at 486, 103 S.Ct. at 1317 (emphasis added).

**17.** The dissent contends that we ignore New Jersey's entire controversy doctrine. However, that doctrine is applicable to federal courts only

by virtue of the Full Faith and Credit Statute. Thus, the foregoing discussion of the Full Faith and Credit Statute subsumes any discussion of the New Jersey entire controversy doctrine.

**1.** Also, I do not join the majority's conclusion that the district court should have dismissed Ivy's complaint under *Younger* when that complaint was first brought. Since the district court did not reach *Younger*, its *Pullman* abstention is

that Ivy waived *England* reservation of its § 1983 claims by unreservedly and voluntarily litigating the freedom of association issue, and having it decided in the state proceedings before attempting any *England* reservation; and by failing to notify the state administrative tribunal of its other constitutional arguments before that tribunal finally decided against Ivy on jurisdictional and liability grounds.

I would hold that all of Ivy's § 1983 claims must be dismissed by the district court. Without a valid *England* reservation, the *Rooker–Feldman* doctrine divests the district court of subject matter jurisdiction over Counts One and Two of Ivy's complaint. If the district court hears those counts, it would in effect be undertaking impermissible lower federal court review of the New Jersey Supreme Court's decision in the *Frank* case. As for Count Three, it is barred by New Jersey's entire controversy doctrine because Ivy did not raise it in the first instance in the state proceedings.

I find no precedent for the majority's view that this appeal turns on equitable considerations, rather than Ivy's clear failure to make timely and effective *England* reservations. Furthermore, even if the majority is correct that Ivy made valid *England* reservations, the majority is wrong that Ivy is nevertheless bound by state findings of fact. *England* guarantees a federal trial *de novo* of all facts material to a party's reserved constitutional claims, state findings of fact notwithstanding.

## I.

Ivy's § 1983 complaint, App. 82–92, consists of three counts. Each count alleges that the exercise of jurisdiction by New Jersey's Department of Law and Public Safety, Division on Civil Rights ("Division") over Ivy pursuant to New Jersey's Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5–1 *et seq.,* is unconstitutional.

Count One alleges the Division's assertion of jurisdiction denies Ivy its First Amendment right of free association. Count Two alleges the administrative process which resulted in the Division's exercise of jurisdiction deprived Ivy of its federal constitutional right to procedural due process. Count Three asserts the LAD is unconstitutionally "void for vagueness"—that is, the statute fails federal due process requirements because it lacks ascertainable standards for determining whether Ivy and other clubs like Ivy are public accommodations—and therefore leaves New Jersey officials with "uncontrolled discretion" to hold "such a club as [Ivy] to be a public accommodation contrary to the Fifth and Fourteenth Amendments' due process requirements." App. 91.

Ivy's three count complaint was first brought against the defendant-appellants, New Jersey's Attorney General and the Director of the Division, *after* the Division finally decided, in the course of fully adversarial proceedings, that it could assert jurisdiction over Ivy under the LAD. The Division's final jurisdictional determination incorporated an express rejection of Ivy's First Amendment freedom of association argument. Thus, Ivy filed its federal complaint after the Division considered and rejected Ivy's First Amendment argument, but before conclusion of other Division proceedings in this case, that is before the Division held Ivy liable for sex discrimination and subject to an order of damages and remedies.

Given the pendency of the state proceedings, the district court stayed Ivy's federal action on *Pullman* abstention grounds. The *Pullman* stay gave New Jersey tribunals an opportunity to decide state law questions in Frank's case which might make it unnecessary to reach Ivy's federal constitutional allegations.[2]

the law of the case. I think the majority's discussion of *Younger* is unnecessary dicta.

2. *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), established that if there are unsettled questions of state law in a federal case that make it unnecessary to decide a federal constitutional

question, the federal court should abstain until the state court has resolved the state questions.

The *Pullman* abstention doctrine reflects the desirability of avoiding unnecessary decisions on constitutional issues. *See generally,* 17A C. Wright, A. Miller & E. Cooper, *Federal Practice*

After suffering adverse jurisdictional, liability, damages and remedies decisions by the Division, Ivy unsuccessfully appealed to New Jersey appellate courts. Ultimately, Ivy lost before the New Jersey Supreme Court, which affirmed the Division's decision that Ivy was subject to the Division's jurisdiction under the LAD and held that the administrative procedures followed by the Division with respect to its exercise of jurisdiction over Ivy "fully comported with administrative due process". *Frank v. Ivy Club*, 120 N.J. 73, 105–111, 576 A.2d 241, 254, 257–261 (1990), *cert. denied sub nom., Tiger Inn v. Frank,* — U.S. —, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991).

Ivy then moved the district court to reopen Ivy's stayed § 1983 action. The district court granted Ivy's motion, finding Ivy had preserved its *England* rights with respect to its § 1983 claims because *England's* overriding concern is that "Federal Constitutional rights be fully litigated." App. 146. Nevertheless, the district court expressed "some hesitation" with its decision, App. 147, and so it certified this question for appeal under 28 U.S.C. 1292(b):

> Whether, on the record before the court, there was a waiver by The Ivy Club of its rights under *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411 [84 S.Ct. 461, 11 L.Ed.2d 440] (1964), it appearing that The Ivy Club's federal constitutional rights were asserted as defenses and decided in administrative proceedings before the New Jersey Division on Civil Rights, but were expressly reserved from assertion by The Ivy Club in subsequent proceedings on the merits before the Appellate Division and the Supreme Court of New Jersey.

App. 154–55.

On appeal of that order, appellants challenge the decision to reopen Ivy's case. They assert Ivy is barred from litigating its federal constitutional claims in the district court because Ivy failed to reserve its *England* rights in the state proceedings and, therefore, Ivy's § 1983 counts are barred by issue preclusion,[3] New Jersey's entire controversy doctrine, and the federal *Rooker–Feldman* doctrine.[4] Ivy responds that it did not waive its *England* rights prior to the *Pullman* abstention, that at all times subsequent to the abstention it properly reserved its § 1983 claims—and, accordingly, dismissal of its federal action is not warranted.

## II.

### *Implied and Express England Reservations*

In *England v. Louisiana State Bd. of Med. Exam.*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), the Supreme Court addressed how a federal litigant, subjected to *Pullman* abstention after properly invoking the jurisdiction of a federal district court, may return to the federal court for a trial of his federal constitutional claims. *England* offers a litigant, who is "compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims" following *Pullman* abstention, *id.*, 375 U.S. at 415, 84 S.Ct. at 464, an *opportunity* to avoid the preclusive effects of the adverse state determination, even one directly rejecting its stayed federal claims. The opportunity depends on timely reservation, i.e., timely objective assertion of *England* rights during the course of state proceedings.

If an *England* reservation is properly made, the litigant who makes it may return to federal district court for a trial *de novo* of his reserved federal questions. *Id.*, 375 U.S. at 416, 84 S.Ct. at 465. Furthermore, the state court should not decide the re-

---

*and Procedure* § 4241 (1988) (hereinafter "—Wright—").

**3.** I do not discuss issue preclusion below, because I conclude Ivy's three counts must be dismissed by operation of the *Rooker–Feldman* and New Jersey entire controversy doctrines alone.

**4.** Alternatively, appellants contend that Ivy's § 1983 action should be dismissed now because the district court erred by not dismissing it in 1986 under the *Younger* abstention doctrine. I do not believe the *Younger* issue should be reached, and given my view of the case, reversal does not require it.

served federal claims. Even if it does, the federal courts will not give preclusive effect to the state decisions on the federal questions when the district court reopens the federal action stayed under *Pullman.* *See* Wright § 4243.

Not all preclusive effects of adverse state decisions are avoided by *England* reservations. State court resolution of the state law question that triggered a *Pullman* abstention "must be given some preclusive effect; otherwise abstention would be a meaningless procedure." *Kovats v. Rutgers,* 749 F.2d 1041, 1046 (3d Cir.1984).

Reservation of *England* rights must be timely and may be express or implied. The Supreme Court described an express reservation as follows:

> [A] party may readily forestall any conclusion that he has elected not to return to the District Court. He may accomplish this by making on the state record the "reservation to the disposition of the entire case by the state courts".... That is, he may inform the state courts that he is exposing his federal claims there only for the purpose of complying with [*Government & Civic Employees Organizing Committee, C.I.O. v. Windsor,* 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957)], and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions.

375 U.S. at 421, 84 S.Ct. at 468.[5] As *England* said, *Windsor* requires a reserving party to "inform" the state court of his federal claims without freely and unreservedly litigating them. *England,* 375 U.S. at 420, 84 S.Ct. at 467.

In summary, then, an *express England* reservation has three elements: (1) explicit expression to the state tribunal of an intent to return to federal court in the wake of an adverse state determination, if any; (2) explicit notification to the state tribunal of the federal questions that would be reserved[6]; and (3) an absence of voluntary litigation by the reserving party of the federal questions that would be preserved for federal trial.

*Implied* reservations also work to guarantee *England* rights to return to district court for a trial *de novo* on federal constitutional questions. *England,* 375 U.S. at 421, 84 S.Ct. at 468 ("an explicit reservation is not indispensable"). Although an implied reservation does not require an explicit expression of intent to return to federal court, it is not effective if "it clearly appears that [the reserving party] voluntarily did more than Windsor required and fully litigated his federal claims in the state courts." *Id.* "[I]f a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." *Id.,* 375 U.S. at 419, 84 S.Ct. at 467. *See also Bradley,* 913 F.2d 1064, 1073; 18 Wright § 4471, p. 712 (1981) ("Even absent an explicit reservation, any party may return the federal claims to federal court unless he voluntarily does more than required in exposing his federal arguments to the state court.").

Thus, an express or implied reservation is not effective if before it is made, the party has "freely and unreservedly" litigated his constitutional issue and the state tribunal has decided it. Also, a valid reservation, express or implied, requires that the state tribunal be notified of the nature of the federal constitutional issues that are

---

**5.** This court has characterized an express reservation as follows:

> [A] party ... subjected to abstention may reserve his federal claims for federal adjudication by informing the state court of the nature of his federal claims, that he does not wish to litigate those claims in state court, "and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions."

*Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1071 (3d Cir.1990), quoting *England,* 375 U.S. at 421, 84 S.Ct. at 467. *Bradley* did not, however, decide "the general parameters of an *England* reservation." *Bradley,* 913 F.2d at 1072.

**6.** Such notification permits the state tribunals to consider the federal questions when deciding the state law issues in dispute. *England,* 375 U.S. at 420, 84 S.Ct. at 467.

reserved. If an effective *England* reservation of federal constitutional issues is made, the federal district court which has abstained under *Pullman* must decide the reserving party's federal questions after the state court has acted. *England*, 375 U.S. at 421, 84 S.Ct. at 468.

### III.

The threshold issue here is whether Ivy properly reserved any of its § 1983 claims for federal trial *de novo*. The timing and character of Ivy's conduct during the state proceedings should determine whether Ivy made or waived any express or implied *England* reservations. Accordingly, the parties' litigation must be described in some detail.[7]

Sally Frank was a student of Princeton University in February 1979 when she filed her first complaint with the Division against Princeton and three male-only eating clubs associated with Princeton, including Ivy. Frank alleged that these entities had discriminated against her on the basis of her gender in violation of the LAD. The Division refused to process that complaint.

In November of 1979 Frank filed a second complaint alleging discrimination and that the eating clubs were "public accommodations" subject to the LAD. This second complaint was summarily dismissed by the Division on December 9, 1981 for lack of jurisdiction because the Division considered the Princeton eating clubs to be distinctly private entities outside the reach of the LAD, and because the Division found no probable cause to support the allegations against Princeton. *See Frank v. Ivy Club*, 228 N.J.Super. 40, 548 A.2d

1142, 1145 (1988) (describing procedural history of Frank's case), *rev'd, Frank v. Ivy Club*, 120 N.J. 73, 576 A.2d 241 (1990). Before this dismissal, Ivy asserted as a defense, among others, its members' rights to freedom of association under the First Amendment. *Id.* Frank appealed the dismissal to the New Jersey Superior Court.

When opposing Frank's appeal of the Division's dismissal of her second complaint, Ivy again raised and fully briefed the freedom of association issue. *See* App. 7–9. On August 1, 1983, the Superior Court reversed and remanded without reaching the merits of either the Division's dismissal of Frank's complaint or Ivy's First Amendment defense, on the grounds that the Division had dismissed without holding a hearing, and without making findings of fact. *See Frank v. Ivy Club*, 548 A.2d at 1145.

When the Division reconsidered Frank's (now amended) complaint on remand, Ivy again asserted its freedom of association defense against the Division's exercise of jurisdiction. This is clear given the language of the Division's May 14, 1985 Finding of Probable Cause, App. 16–67, and other portions of the record on appeal.[8] *See, e.g.,* App. 10–14 (Brief of Respondents Ivy Club and The University Cottage Club, stamped "received" on December 2, 1985 by New Jersey's Office of Administrative Law).

After conducting extensive fact-finding and holding two adversarial fact-finding conferences, fully judicial in nature,[9] the Division issued its Finding of Probable Cause. The Finding addressed two issues:

---

**7.** The majority has indicated that certain procedural events of the state proceedings are not relevant here. Maj. Op., at 274. I believe Ivy's conduct during the adversarial proceedings leading up to the Division's final jurisdictional determination of February 6, 1986 is most relevant to the question of whether Ivy waived its *England* rights.

**8.** The parties have provided this court with only snippets of papers filed by Ivy in the state proceedings. Nevertheless, the record demonstrates sufficiently that Ivy fully briefed its First Amendment freedom of association argument

to the Division, both before the Division's initial May 14, 1985 Finding of Probable Cause on jurisdiction, and then again, before the Division made its final jurisdictional determination on February 6, 1986.

**9.** At these conferences all parties were represented by counsel and were offered the opportunity to make statements, to call and cross-examine witnesses whose testimony could be supplemented and/or corrected by affidavits, to introduce documentary evidence supporting their contentions, and to make extensive legal arguments through briefs, reply briefs and letter memoranda. *See* App. 68–81.

probable discrimination and jurisdiction under the LAD.

Concerning jurisdiction, the Finding concluded on undisputed facts that the defendant eating clubs including Ivy were related integrally to Princeton University, and therefore, were not "distinctly private" associations exempt from the Division's jurisdiction under the LAD.[10] With respect to Ivy's First Amendment defense, the Division's Finding of Probable Cause said:

> [The eating clubs] assert that if the L.A.D. is interpreted as reaching the Clubs, the members' constitutional rights of privacy and freedom of association would be violated. The Clubs claim an affirmative right to discriminate based on their members [sic] associational preference. After careful consideration, *the Division finds that applying the L.A.D. to Respondent Clubs would not violate any constitutional rights of association.*

App. 60 (emphasis added). Then, after several pages of analysis of the "conflict between associational rights and anti-discrimination legislation ... recently examined by the Supreme Court in *Roberts v. United States Jaycees,* [468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ]", App. 60–65, the Division expressly rejected the clubs' freedom of association defense again by saying, "free association rights would not be violated by the assertion of jurisdiction over these 'private clubs' that are integrally connected with Princeton University". App. 65 (emphasis added).

Thus, the jurisdictional portion[11] of the Finding of Probable Cause indicates clearly that before the Division asserted probable jurisdiction, Ivy voluntarily litigated the same freedom of association issue it now seeks to relitigate in federal court. The Finding of Probable Cause shows also that the Division explicitly rejected Ivy's freedom of association defense.

After the Finding of Probable Cause, Ivy and the University Cottage Club continued to assert freedom of association arguments directed at the jurisdictional issue. During adversarial proceedings leading to the Division's final jurisdictional decision,[12] Ivy and the Cottage Club devoted at least ten pages of two joint briefs to the Division to the freedom of association issue. *See* App. 10–15.

Nevertheless, on February 6, 1986, the Division determined finally that it could exercise LAD jurisdiction over Ivy and the other eating clubs despite their freedom of association arguments. App. 68–81. The Division's final jurisdictional order rejected Ivy's freedom of association defense by adopting the Finding of Probable Cause's prior rejection of the defense. *See* App. 74 (February 16, 1986 final jurisdictional order expressly incorporates "the undisputed facts, *conclusions and legal reasoning* as set forth in the jurisdictional section of the Finding of Probable Cause") (emphasis added); App. 80–81 (same order, wherein "Director rejects respondents' exceptions and affirms the finding and determination as rendered in the Jurisdictional section of the Finding of Probable Cause and the Initial Decision in this matter."); *see also* note 15, herein.

On February 13, 1986, that is *after* the Division finally asserted LAD jurisdiction and rejected Ivy's freedom of association

---

**10.** *See N.J.S.A.* 10:5–5(*l*).

**11.** The "discrimination" portion of the Finding concluded on certain undisputed facts that probable cause existed to believe the eating clubs and Princeton violated the LAD "by discriminating against women in places of public accommodation and by aiding and abetting such discrimination." App. 67.

**12.** These adversarial proceedings were first conducted by an administrative law judge ("ALJ") in New Jersey's Office of Administrative Law ("OAL"), which took jurisdiction of the case after Frank requested it be transferred to the OAL as a contested case pursuant to *N.J.S.A.* 10:5–13 and *N.J.A.C.* 13:4–12.1(c) and (d).

On December 12, 1985, in response to Frank's motion for summary decision on the issue of jurisdiction, the ALJ found that there were no material facts in dispute with respect to the jurisdictional question, and that the Director's initial May 14, 1985 finding of jurisdiction should be considered final. This recommendation of the ALJ was thereafter adopted by the Director's February 16, 1986 Order of Partial Summary Decision on Jurisdiction. *See Frank v. Ivy Club,* 548 A.2d at 1146.

defense, Ivy filed its § 1983 action in federal court. Count One alleged that the Division's exercise of jurisdiction violated Ivy's constitutional right to freedom of association, the same argument the Division rejected when it exercised jurisdiction under the LAD. Counts Two and Three alleged the Division's exercise of jurisdiction was unconstitutional on two grounds never raised before the Division: the Division's determination of jurisdiction violated Ivy's federal right to procedural due process, and the LAD was unconstitutionally void for vagueness.

Given the pendency of the Division's proceedings against Ivy, the district court stayed Ivy's § 1983 action by abstaining under *Pullman* on June 9, 1986. Also, the district court ordered that the stay "not be interpreted as a ruling that plaintiffs have properly reserved their federal constitutional claims for federal court adjudication." App. 94.

Then, on July 28, 1986, the Division issued its final order that Ivy was liable for discrimination under the LAD.[13] Only later, on July 29, 1986, at the start of administrative hearings before an ALJ on the issue of damages and remedies, did Ivy first expressly indicate on the record of the state proceedings that it intended to reserve *England* rights.[14]

Nearly a year later, on May 26, 1987, the Division issued its final decision in Frank's case. This order adopted in part and modified in part the ALJ's recommendation of appropriate remedies. App. 99–115. It

also reaffirmed the Division's earlier rejection of Ivy's freedom of association defense against the Division's exercise of jurisdiction under the LAD.[15]

After this last agency order in the *Frank* case, Ivy appealed the Division's adverse decisions to the New Jersey Superior Court. Ivy's appeal purported to make an *England* reservation of Ivy's federal constitutional claims. App. 133.

On October 4, 1988, the Superior Court reversed the Division's decisions on jurisdiction and liability, holding that the Chief of the Enforcement Bureau of the Division had erred during the initial fact-finding conference leading up to the Division's initial Finding of Probable Cause. The Superior Court said the Chief erred by exceeding his authority by resolving disputed facts; and that the Division, by relying on the facts as resolved by the Chief, had abused its discretion. *Frank v. Ivy Club*, 548 A.2d at 1153–54.

Sally Frank then appealed the Superior Court's reversal of the Division's final jurisdictional and liability decisions to the New Jersey Supreme Court. Although Ivy submitted no new briefs to the state supreme court, Ivy's appellate brief for the Superior Court, which contained a purported *England* reservation, was forwarded to the state supreme court.

Frank prevailed before the New Jersey Supreme Court. It reversed the Superior Court and affirmed the Division's final decisions on jurisdiction and liability. Al-

---

**13.** After the ALJ's jurisdictional ruling of December 12, 1985, *see* note 12 herein, Frank filed a Motion for Summary Decision against Ivy on the issue of liability. On June 16, 1986, the ALJ granted Frank's motion. The Director's July 28, 1986 liability decision adopted the ALJ's summary decision on Ivy's liability under the LAD, and remanded the case back to the OAL for further proceedings on remedies tó be afforded Frank. *See Frank v. Ivy Club*, 548 A.2d at 1147.

**14.** At the July 29, 1986 OAL hearing on damages and remedies before an ALJ, counsel for Ivy said, orally (App. 134):

At this point, we also seek to preserve our federal claim for consideration by federal court and we specifically reserve them under the England Reservation Doctrine, though we may change in our decision of this matter. At

this point, Ivy will not be arguing any federal issues.

**15.** The Director reaffirmed the prior rejection of Ivy's freedom of association argument by saying (App. 107):

The ALJ's discussion on the First Amendment rights of the clubs is also rejected as inconsistent with the jurisdictional finding. In the Finding of Probable Cause ... which was incorporated in my February 6, 1986 ruling [on jurisdiction] ... I specifically addressed the clubs' First Amendment claims of freedom of association rights and found that any rights that they may have to freely associate did not include a right to discriminate on the basis of sex. The ALJ's reliance on free association rights is therefore misplaced. My February 6, 1986 ruling is hereby reaffirmed.

though the supreme court did not rule directly on the merits of Ivy's constitutional defense against the Division's exercise of jurisdiction, it took note that the Division had expressly rejected Ivy's "constitutional free-association" argument when making the Finding of Probable Cause. *See Frank v. Ivy Club*, 576 A.2d at 251. The supreme court found that the Division's handling of Ivy's case and the Superior Court's two reviews of it constituted a "procedure [which] accorded the parties their administrative due process rights". *Id.* at 244.

After the New Jersey Supreme Court affirmed the Division's adjudication, Ivy moved the district court to reopen the stayed § 1983 action, and the district court did. The court also certified the *England* question for defendants' interlocutory appeal.

## IV.

### *Ivy's Waiver of England Rights*

I would hold that Ivy reserved none of its § 1983 claims for trial in federal district court.

### A. *Freedom of Association Claim*

Ivy waived *England* rights with respect to its freedom of association claim (Count One) by *freely and unreservedly litigating* that issue before the Division's final jurisdictional determination on February 6, 1986. In *England,* the Supreme Court declared clearly,

> We now explicitly hold that if a party *freely and without reservation* submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then—whether or not he seeks direct review of the state decision in this Court—he has elected to forgo his right to return to the District Court.

375 U.S. at 319, 84 S.Ct. at 467 (emphasis added).

The record on appeal shows Ivy voluntarily litigated the merits of its freedom of association defense against the Division's exercise of jurisdiction without asserting any *England* reservation before the Division's final February 6, 1986 jurisdictional decision. Indeed, Ivy unreservedly litigated its freedom of association defense from the earliest state proceedings through the Division's final rejection of Ivy's position: Ivy raised the defense when Frank filed her 1979 complaint; Ivy briefed the issue when opposing Frank's 1982 appeal to the New Jersey Superior Court; Ivy advanced the freedom of association defense before the Division made its Finding of Probable Cause, which expressly rejected Ivy's argument; and Ivy continued to litigate the same defense during the fully adversarial proceedings which resulted in the Division's February 6, 1986 final order on jurisdiction, which rejected Ivy's constitutional argument. All this occurred before Ivy did anything arguably constituting an express or implied *England* reservation.

In sum, Ivy unreservedly litigated the freedom of association issue and had it decided by a state tribunal before making any *England* reservation.[16] This constitutes a waiver of *England* rights with respect to Count One of Ivy's § 1983 action. There is no evidence Ivy was compelled to litigate the freedom of association issue unreservedly and as fully as it did.

If state litigants could successfully assert express or implied *England* reservations *after* they freely and voluntarily litigated their federal constitutional allegations *and* state tribunals rejected them, then litigants would be free to test their federal claims in state proceedings, and if unsuccessful there, get a second chance in § 1983 actions in federal district courts. Such an expansive interpretation of *England* would controvert the full faith and credit federal courts must give to state decisions reviewed by state courts, and result in repetitive, vexatious litigation.

---

**16.** Ivy made its first oral reservation of *England* rights on July 29, 1986, at the start of administrative proceedings on damages and remedies, App. 134; and Ivy made its first written reservation later, on October 5, 1987, when Ivy filed its appeal from all of the Division's adverse orders with the Superior Court of New Jersey. App. 133.

Even if filing a federal action might by itself in some circumstances qualify as an implied *England* reservation, Ivy's § 1983 complaint was filed too late to be an implied reservation. Ivy's federal action, like its belated express attempts to reserve, followed Ivy's own efforts to litigate the First Amendment issue, *and* the Division's final jurisdictional order rejecting Ivy's First Amendment defense. *England* reservations should precede the state decisions on federal questions that would be avoided.

That Ivy's belated attempts to reserve followed a final state *agency* determination of jurisdiction rather than a state *court* decision on the issue should not help Ivy's case. The essential elements and timing of valid *England* reservations should not differ depending on whether the state decision to be avoided originated with an administrative tribunal and was subjected to higher state court review [17]—or, rather, with a fully judicial state court.

### B. *Procedural Due Process and Void for Vagueness Claims*

Like Ivy's First Amendment claim, its procedural due process and void for vagueness arguments (Counts Two and Three, respectively) were not properly reserved by Ivy. Although Ivy did not unreservedly litigate these two issues in the state proceedings, Ivy also did not inform the Division of them before the Division decided the relevant jurisdictional question. Thus, Ivy failed to do what *Windsor* requires as a prerequisite of reservation: Ivy did not give the state tribunal an opportunity to decide the state law jurisdictional question in light of Ivy's federal due process and void for vagueness arguments.

Under *England,* it is not enough to simply refrain from litigating in state proceedings the federal constitutional questions that would be reserved for a subsequent federal trial. An effective *England* reservation requires that a reserving litigant notify the state tribunal of the federal

questions. *Bernardsville Quarry v. Borough of Bernardsville,* 929 F.2d 927, 929 (3d Cir.1991), *petition for cert. filed,* 60 U.S.L.W. 3057 (U.S. June 3, 1991) (No. 91–111).

Ivy never informed the state administrative tribunals of its procedural due process and void for vagueness arguments. Ivy cannot now assert successfully that it reserved these claims, even if it did refrain from litigating them during the course of the state proceedings.

In conclusion, Ivy failed to make an effective *England* reservation in this case. Accordingly, each of its federal claims must be exposed to legal doctrines which require the district court to dismiss Ivy's complaint.

### V.

*Absent Effective England Reservations, Each of Ivy's § 1983 Claims Must Be Dismissed*

Although the district court only certified the question of whether Ivy properly reserved its § 1983 claims under *England,* the undisputed facts of this case permit this court to conclude Ivy's unreserved claims must be dismissed on several grounds. The *Rooker–Feldman* jurisdictional doctrine divests the district court of subject matter jurisdiction over Counts One and Two. New Jersey's entire controversy doctrine requires dismissal of Count Three.

### A. *Under Rooker–Feldman, the District Court Does Not Have Subject Matter Jurisdiction to Hear Counts One and Two.*

In *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), the Supreme Court established a jurisdictional rule which bars lower federal courts from reviewing state court judgments. The doctrine has much the same effect as claim and issue preclusion. *See* 18 Wright § 4469.

---

17. The Division's determinations were subject to state court review, state courts' reviewed the Division's determinations in the *Frank* case on more than one occasion, and pursuant to Ivy's

appeal from the Division's adverse jurisdictional determination, the New Jersey Supreme Court affirmed.

The Supreme Court reinvigorated the doctrine in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). *Feldman* reiterated *Rooker*'s rule that a federal district court is without authority to review final determinations of state or local courts because such review can only be conducted by the Supreme Court pursuant to 28 U.S.C. § 1257. *Id.,* 460 U.S. at 476, 103 S.Ct. at 1311 (citing *Rooker*). *Feldman* also held that, to the extent federal plaintiffs effectively seek review of the constitutionality of a state or local court's *judicial* (rather than administrative or legislative) actions, a district court has no jurisdiction.

> [District courts] do not have jurisdiction ... over challenges to state-court decision in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in [the United States Supreme Court].

*Id.,* 460 U.S. at 486, 103 S.Ct. at 1317. Nevertheless, to the extent federal plaintiffs seek *generally* to challenge the federal constitutionality of a local or state statute or judicially promulgated rule, *Feldman* held a district court *does* have jurisdiction to hear plaintiffs' claims. *Id.,* 460 U.S. at 482–86, 103 S.Ct. at 1315–17.

*Rooker–Feldman,* then, stands for the following two propositions relevant to this appeal: (1) to the extent Ivy seeks district court review of the constitutionality of New Jersey judicial acts determining Ivy's rights in the *Frank* case, the district court has *no* jurisdiction; and, (2) to the extent Ivy mounts a *general* challenge to the constitutionality of the LAD, the district court *has* jurisdiction to hear that claim.

Applied here, *Rooker–Feldman* bars the district court from asserting subject matter jurisdiction over Counts One and Two of Ivy's complaint, that is, Ivy's freedom of association and procedural due process claims. These § 1983 counts attempt to nullify the New Jersey Supreme Court's affirmation of the Division's actual assertion of jurisdiction over Ivy in the *Frank* case. If Ivy were to litigate these counts in district court, the district court would be effectively reviewing the state supreme court's judicial determination that the Division properly exercised jurisdiction over Ivy. *Rooker–Feldman*'s jurisdictional rule precludes this.[18] Only the United States Supreme Court may review the New Jersey Supreme Court's final judgment in the *Frank* case.[19]

*Rooker–Feldman* does not, however, bar the district court's exercise of jurisdiction over the general constitutional challenge to the LAD represented by Count Three of Ivy's § 1983 action.[20] This general challenge does not allege the unconstitutionality of a specific state "judicial act", which allegation *Rooker–Feldman* would not permit the district court to hear. No New Jersey tribunal, quasi-judicial or fully judicial in nature, ever reached the question of whether the LAD is unconstitutionally vague under the Fifth and Fourteenth Amendments, as Ivy alleges it is.

### B. *New Jersey's Entire Controversy Doctrine Compels the District Court to Dismiss Count Three*

New Jersey's entire controversy doctrine would bar New Jersey courts from hearing

---

**18.** *Rooker–Feldman*'s jurisdictional bar operates only to the extent Ivy did *not* make a valid *England* reservation of its first two counts. If Ivy made valid reservations of these counts, then the district court would have jurisdiction to hear these claims irrespective of *Rooker–Feldman* doctrine. *Rooker– Feldman* should not destroy a district court's jurisdiction over properly reserved federal constitutional questions, even when state courts previously have decided those issues. Otherwise, *Rooker–Feldman* would defeat *England*'s utility where federal plaintiffs subjected to *Pullman* abstention are

compelled involuntarily to have their federal constitutional claims decided by state courts.

**19.** Ivy has declined to seek federal Supreme Court review of the state supreme court decision.

**20.** To the extent Count Three may also be read as a constitutional challenge to the Division's particular exercise of jurisdiction over Ivy in the *Frank* case, the district court is without jurisdiction.

any of Ivy's § 1983 claims which it could have, but did not, raise in the first instance in the New Jersey proceedings. The doctrine, now codified at N.J.R.Civ.P. 4:30A,[21] requires that "a party who has elected to hold back from the first proceeding a related component of the controversy be barred from thereafter raising it in a subsequent proceeding." *Woodward–Clyde v. Chem. & P. Sciences,* 105 N.J. 464, 523 A.2d 131, 135 (1987) (citations omitted). The doctrine "requires that a person assert in one action all related claims against a particular adversary or be precluded from bringing a second action based on the omitted claims against that party." *Melikian v. Corradetti,* 791 F.2d 274, 279 (3d Cir.1986). A party "is precluded from litigating in a subsequent proceeding both claims that it actually litigated and claims that it could have litigated in an earlier proceeding." *Bernardsville Quarry,* 929 F.2d at 930.

"The New Jersey entire controversy doctrine is a particularly strict application of the rule against splitting a cause of action. Like all versions of that rule its purpose is to increase judicial efficiency." *Bennun v. Rutgers State University, et al.,* 941 F.2d 154, 163 (3d Cir.1991), citing *Bernardsville Quarry,* 929 F.2d at 930. The entire controversy doctrine "ensure[s] that, to the extent possible, disputes are settled in a single litigation." *O'Shea v. Amoco Oil Co.,* 886 F.2d 584, 594 (3d Cir.1989).

Under the entire controversy doctrine, all possible claims must be brought in a single action:

> [If] the litigants in the action as framed will, after final judgment therein is entered, be likely to have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation. That result must obtain whether or not the component constitutes either an independent cause of action by technical common law definition or an independent claim which, in the abstract, is separately adjudicable.

*Melikian,* 791 F.2d at 279–80 (citation omitted); *O'Shea,* 886 F.2d at 590–91 (same).

We must apply this test to Count Three [22] of Ivy's federal action in order to decide whether Ivy's void for vagueness argument could have been decisive of Ivy's rights in the *Frank* case. If it could have been, the entire controversy doctrine would bar a New Jersey court from hearing Count Three for the first time now. *See O'Shea,* 886 F.2d at 591; *Bernardsville Quarry,* 929 F.2d at 929.

A New Jersey court confronting Ivy's void for vagueness claim for the first time now would dismiss it under the entire controversy doctrine. A New Jersey court would find that Ivy could have, but did not, raise the void for vagueness challenge to the LAD at the start of the state proceedings; and that the issue might potentially have determined the parties' respective rights and liabilities under the LAD.

Following the Full Faith and Credit Act, 28 U.S.C. § 1738, the district court must do what a state court would. *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982) (construing 28 U.S.C. § 1738). Since the New Jersey Supreme Court's final judgment has ended the *Frank v. Ivy* litigation, the district court now must apply the entire controversy doctrine, as a New Jersey Court

---

**21.** *N.J.R.Civ.P.* 4:30A provides:
Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine.

**22.** Ivy's procedural due process claim (Count Two) is also susceptible to defeat by entire controversy doctrine analysis because Ivy did not initially raise that claim in the state proceedings. Nevertheless, I would rest dismissal of Count Two on *Rooker–Feldman* grounds alone.

would, to dismiss Ivy's void for vagueness claim, which Ivy never raised at the start of the state proceedings.

## VI.

The majority concludes on "a balancing of the equities" that "a sense of basic fairness dictates that Ivy be permitted to litigate its federal claims in the federal forum", Maj.Op. at 282–83; and that "Ivy, in the unique circumstances of this case, sufficiently reserved its right to litigate its federal claims in federal court." *Id.* at 273. The circumstances here do not warrant the majority's balancing approach to the issue of whether Ivy made effective *England* reservations.

Ivy's *England* rights should turn on Ivy's conduct during the state proceedings, not on some vague notion that "basic fairness dictates" Ivy's § 1983 action should be reopened. The "equities" and "basic fairness" approach taken by the majority does not advance analysis of this case, is without precedent, and will only confuse later litigants as to *what* they must do, and *when* they must do it, in order to preserve *England* rights.

The majority also confuses *England* analysis, which here should be primarily an inquiry into Ivy's litigation conduct, when it says the district court's *Pullman* abstention "deprived Ivy of a full and fair opportunity to litigate its federal claims", *id.* at 283; and that the district court "repeatedly put Ivy in a 'catch–22' situation by not deciding the reservation issue at [the time of abstention]". *Id.* at 281. The majority implies that a district court must decide the validity of a party's *England* reservation when the court first abstains under *Pullman*. I find no support for that proposition.

The validity of an *England* reservation can only be determined by a district court when a party seeks to *reopen* stayed federal claims at the conclusion of state proceedings. A party's actions in state proceedings following *Pullman* abstention may ultimately defeat its *England* rights, as

when the party fails (like Ivy did) to notify state tribunals of federal issues that would be reserved. Thus, the district court's refusal to rule on the *England* question when it abstained is not dispositive of whether Ivy properly reserved. Ivy's tardiness going to district court and asserting *England* rights *after* suffering an adverse jurisdictional determination is the cause of the *England* problem in this case.

That "defendants failed to raise any objection to Ivy's *England* reservations in the state court", Maj.Op. at 282, is perhaps the majority's strongest reason for finding Ivy did not waive its *England* rights. The majority relies on our opinion in *Bradley*, 913 F.2d 1064, where we found an effective *England* reservation, *in part* because of a failure to object to it. However, even as the majority admits, *Bradley* is distinguishable on several grounds. Most important is that the reserving party in *Bradley* filed his federal action *before* entering the state proceedings, and he made his *England* intentions clear to the state tribunals in a timely fashion.

Ivy did nothing constituting objective evidence of an intent to return to federal court until *after* it suffered the Division's final adverse jurisdictional determination. Ivy did not file an action in federal court before the Division's final decision, and Ivy expressly asserted *England* only after being confronted with an adverse determination on liability. Thus, *Bradley* is not on point. Ivy's purported *England* reservations should be viewed as ineffective despite appellants' failure to object to the purported reservations during the state proceedings.

I would hold that if a party waives its *England* rights by making belated reservations, those defective reservations should not accomplish what timely reservations would have—avoidance of the preclusive effects of prior state adjudications—even if the late reservations caused state appellate courts to "acquiesce" to the untimely reservations. That the New Jersey appellate

courts "appear to have acquiesced to Ivy's reservation", Maj.Op. at 281, should not be the measure of whether Ivy asserted *England* in time. Indeed, those courts could *not* consider Ivy's procedural due process and void for vagueness arguments when reviewing the Division's final jurisdictional order, because Ivy did not raise those questions until *after* the order was issued.

Also, the untimeliness of Ivy's purported reservations should not be cured just because Ivy "refrained from litigating its federal constitutional claims" after the district court's decision to abstain, and thereafter "expressly stated its wishes to preserve its right to litigate in federal court". *Id.* at 281. Only objectively ascertainable attempts to reserve made *before* a decision on the merits that would be avoided should be effective, even if that decision originated with a quasi-judicial tribunal.

### VII.

I do not agree that Ivy "detrimentally relied" on the district court's "judicial grant of jurisdiction" over Ivy's § 1983 action, Maj.Op. at 283, and on the court's decision to stay. *Id.* at 282. The majority relies on such findings of "detrimental reliance" to justify both the conclusion that Ivy lacked a "full and fair opportunity to litigate its federal claims in the state court", and also the "balancing of the equities" approach taken to decide the case. *See id.* at 282, 283.

The record shows, however, that Ivy did not detrimentally rely on the district court's actions. The district court's stay order *explicitly warned* Ivy that the *Pullman* stay should "not be interpreted as a ruling that plaintiffs have properly reserved their federal constitutional claims for federal court adjudication." App. 94.

So, if there was no detrimental reliance, then the district court's jurisdiction over

Ivy's action (and the staying of it) did not destroy Ivy's full and fair *opportunity* to either litigate its constitutional questions *or* reserve them under *England* before the Division's final jurisdictional determination (which preceded any district court actions). It follows that, in the wake of the New Jersey Supreme Court decision in the *Frank* case, state law doctrines of finality and New Jersey's entire controversy doctrine (which the majority ignores) should work a preclusive effect on Count Three of Ivy's action. Furthermore, to the extent Ivy did not "detrimentally rely" on the district court, the majority's resort to equitable analysis is misplaced.

### VIII.

Assuming arguendo that the majority is correct that Ivy has effectively reserved *England* rights in the circumstances of this case, its conclusion that Ivy will be bound in the district court by some of the state findings of fact is wrong. *See* Maj. Op. at 284. After making an effective *England* reservation, a litigant "may not be unwillingly deprived" of district court determination of the facts in his case. *England*, 375 U.S. at 417, 84 S.Ct. at 465. Indeed, once a valid reservation is made, even United States Supreme Court review of a state court decision would be an "inadequate substitute" for a determination in the first instance by a district court of all factual issues material to Ivy's claims, state findings of fact notwithstanding. *Id.*, 375 U.S. at 416, 84 S.Ct. at 465.

In conclusion, I respectfully dissent and would reverse the district court and remand for dismissal of Ivy's § 1983 action.